No. 22-2835

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

BARBARA TULLY, ET AL.,

*Plaintiffs-Appellants,*

v.

PAUL OKESON, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
Southern District of Indiana, No. 1:20-cv-01271-JPH-DLP,
The Honorable James Patrick Hanlon, Judge

**RESPONSE BRIEF FOR APPELLEES**

Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-6255
Tom.Fisher@atg.in.gov

THEODORE E. ROKITA
Attorney General of Indiana

THOMAS M. FISHER
Solicitor General

JAMES A. BARTA
Deputy Solicitor General

MELINDA R. HOLMES
RAZI S. LANE
Deputy Attorneys General

*Counsel for Defendants-Appellees*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

JURISDICTIONAL STATEMENT.................................................................2

STATEMENT OF THE ISSUES ...................................................................2

STATEMENT OF THE CASE ........................................................................2

    I.     Legal Background.................................................................... 2

        A.    The Twenty-Sixth Amendment ...................................2

        B.    Indiana election law ...................................................4

        C.    Indiana's response to COVID-19 for the 2020 primary..........................6

    II.    Procedural Background .........................................................7

        A.    Preliminary-injunction proceedings...........................8

        B.    Appellate proceedings.................................................9

        C.    Remand proceedings.................................................12

SUMMARY OF THE ARGUMENT.................................................................13

ARGUMENT...................................................................................................15

I.     This Court's Decision Rejecting Plaintiffs' Twenty-Sixth
      Amendment Theory Controls.................................................16

II.    This Court's Earlier Ruling That the Twenty-Sixth Amendment's
      "Right To Vote" Does Not Encompass Mail-In Voting Is Correct....................19

        A.    As the U.S. Supreme Court held, refusing to indulge a preference
             for mail-in voting does not implicate the "right to vote" ........................19

        B.    History supports this Court's holding that the "right to vote"
             does not protect a preference for mail-in voting .................................24

        C.    Precedent supports this Court's holding that the "right to vote"
             does not protect a preference for mail-in voting .................................31

i

D.      Plaintiffs' remaining arguments lack merit ...............................34

III.    Making It Easier for the Elderly To Vote Does Not "Deny" or "Abridge"
        Any Rights Protected by the Twenty-Sixth Amendment...................35

        A.      Abridging the right to vote requires intentionally making it
                harder to vote on account of age ...............................................35

        B.      Making it easier for the elderly to vote by mail does not abridge
                anyone's right to vote on account of age ...................................39

        C.      Plaintiffs' criticisms miss the mark ........................................43

        D.      Plaintiffs are not entitled to universal mail-in voting...........................47

CONCLUSION ..................................................................................49

# TABLE OF AUTHORITIES

CASES

*Agostini v. Felton,*
  521 U.S. 203 (1997) ............................................................................... 19

*Alden v. Maine,*
  527 U.S. 706 (1999) ............................................................................... 28

*Am. Party of Tex. v. White,*
  415 U.S. 767 (1974) ......................................................................... 23, 31

*Barr v. Am. Assoc. of Pol. Consultants, Inc.,*
  140 S. Ct. 2335 (2020) ..................................................................... 47, 48

*Brnovich v. Democratic Nat'l Comm.,*
  141 S. Ct. 2321 (2021) ...............................................................*passim*

*Bullock v. Carter,*
  405 U.S. 134 (1972) ......................................................................... 20, 21

*Burdick v. Takushi,*
  504 U.S. 428 (1992) ............................................................................... 20

*Carrington v. Rash,*
  380 U.S. 89 (1965) ............................................................................. 2, 34

*Chisholm v. Georgia,*
  2 U.S. (Dall.) 419 (1793) ..................................................................... 28

*City of Mobile v. Bolden,*
  446 U.S. 55 (1980) ........................................................... 23, 30, 37, 44

*Colo. Project-Common Cause v. Anderson,*
  495 P.2d 220 (Colo. 1972) .................................................................. 33

*Common Cause Ind. v. Lawson,*
  977 F.3d 663 (7th Cir. 2020) ......................................................... 18, 31

*Common Cause Ind. v. Lawson,*
  978 F.3d 1036 (7th Cir. 2020) ............................................................ 18

*Crawford v. Marion Cnty. Election Bd.,*
  553 U.S. 181 (2008) ...................................................................*passim*

CASES [CONT'D]

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
    545 U.S. 546 (2005) .......................................................................28

*Fish v. Schwab*,
    957 F.3d 1105 (10th Cir. 2020).................................................17

*Frank v. Walker*,
    768 F.3d 744 (7th Cir. 2014)......................................................37

*Frost v. Corp. Comm'n of Okla.*,
    278 U.S. 515 (1929) .......................................................................48

*Gamble v. United States*,
    139 S. Ct. 1960 (2019) .......................................................... 30, 34

*Gomillion v. Lightfoot*,
    364 U.S. 339 (1960) .......................................................................36

*Goosby v. Osser*,
    409 U.S. 512 (1973) .......................................................................20

*Griffin v. Roupas*,
    385 F.3d 1128 (7th Cir. 2004)........................................*passim*

*Harman v. Forssenius*,
    380 U.S. 528 (1965) .................................................... 37, 44, 45

*Harper v. Va. State Bd. of Elections*,
    383 U.S. 663 (1966) .......................................................................22

*Hill v. Stone*,
    421 U.S. 289 (1975) ............................................................ 20, 21

*Houston Cmty. Coll. Sys. v. Wilson*,
    142 S. Ct. 1253 (2022) ........................................................ 25, 42

*Howe v. City of Akron*,
    801 F.3d 718 (6th Cir. 2015)......................................................17

*Ill. Republican Party v. Pritzker*,
    973 F.3d 760 (7th Cir. 2020).......................................................48

*Illinois v. Lidster*,
    540 U.S. 419 (2004) .......................................................................23

CASES [CONT'D]

*Jolicoeur v. Mihaly*,
    488 P.2d 1 (Cal. 1971) ...............................................................32

*Kaku Nagano v. Brownell*,
    212 F.2d 262 (7th Cir. 1954)................................................. 1, 17

*Kemp v. Liebel*,
    877 F.3d 346 (7th Cir. 2017) ...................................................16

*Kimel v. Fla. Bd. of Regents*,
    528 U.S. 62 (2000) ..................................................................46

*Kramer v. Union Free Sch. Dist. No. 15*,
    395 U.S. 621 (1969) ........................................................... 20, 27

*Lane v. Wilson*,
    307 U.S. 268 (1939) ...................................................... 23, 37, 44

*Lassiter v. Northampton Cnty. Bd. of Elections*,
    360 U.S. 45 (1959) ............................................................. 24, 37

*Lee v. Va. State Bd. of Elections*,
    843 F.3d 592 (4th Cir. 2016) ...................................................46

*Levin v. Commerce Energy, Inc.*,
    560 U.S. 413 (2010) ................................................................47

*Luft v. Evers*,
    963 F.3d 665 (7th Cir. 2020).................................... 8, 37, 43, 47

*Mays v. LaRose*,
    951 F.3d 775 (6th Cir. 2020).............................................. 31, 34

*McDonald v. Bd. of Election Comm'rs of Chi.*,
    394 U.S. 802 (1969) ..........................................................*passim*

*Miller Brewing Co. v. Joseph Schlitz Brewing Co.*,
    605 F.2d 990 (7th Cir. 1979)....................................................17

*N. Ind. Bank & Tr. Co. v. State Bd. of Fin. of Ind.*,
    457 N.E.2d 527 (Ind. 1983)......................................................48

*NLRB v. S.W. Gen., Inc.*,
    580 U.S. 288 (2017) ................................................................27

CASES [CONT'D]

*O'Brien v. Skinner*,
  414 U.S. 524 (1974) ........................................................................20

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) .........................................................33

*Ohio State Conf. of NAACP v. Husted*,
  No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014) .......................33

*Oregon v. Mitchell*,
  400 U.S. 112 (1970) ................................................................*passim*

*Org. for Black Struggle v. Ashcroft*,
  978 F.3d 603 (8th Cir. 2020) .........................................................31

*Pabey v. Pastrick*,
  816 N.E.2d 1138 (Ind. 2004) ...........................................................5

*Pearson v. Edgar*,
  153 F.3d 397 (7th Cir. 1998) .................................................... 13, 17

*Price v. N.Y. State Bd. of Elections*,
  540 F.3d 101 (2d Cir. 2008) ..........................................................33

*Reno v. Bossier Par. Sch. Bd.*,
  528 U.S. 320 (2000) ......................................................................35

*Rhode Island v. Massachusetts*,
  37 U.S. 657 (1838) ........................................................................34

*Richardson v. Tex. Sec'y of State*,
  978 F.3d 220 (5th Cir. 2020) .........................................................31

*Rothner v. City of Chicago*,
  929 F.2d 297 (7th Cir. 1991) .................................................... 17, 19

*Sessions v. Morales-Santana*,
  137 S. Ct. 1678 (2017) ..................................................................47

*Shalala v. Ill. Council on Long Term Care, Inc.*,
  529 U.S. 1 (2000) .........................................................................19

*Shelby Cnty. v. Holder*,
  570 U.S. 529 (2013) .................................................................. 2, 34

iv

CASES [CONT'D]

*Sherley v. Sebelius,*
  689 F.3d 776 (D.C. Cir. 2012) ....................................................................17

*Smith v. Allwright,*
  321 U.S. 649 (1944) ..................................................................................36

*Smith v. Meese,*
  821 F.2d 1484 (11th Cir. 1987)..................................................................32

*Stanton v. Stanton,*
  421 U.S. 7 (1975) .....................................................................................47

*In re Texas,*
  602 S.W.3d 549 (Tex. 2020) ......................................................................41

*Tex. Democratic Party v. Abbott,*
  978 F.3d 168 (5th Cir. 2020)...............................................................*passim*

*Tex. Democratic Party v. Abbott,*
  No. 20-50407, 2020 WL 5422917 (5th Cir. Sept. 10, 2020)......................10

*Tex. League of United Latin Am. Citizens v. Hughs,*
  978 F.3d 136 (5th Cir. 2020).....................................................................31

*Tully v. Okeson,*
  141 S. Ct. 2798 (2021) ..............................................................................12

*Tully v. Okeson,*
  977 F.3d 608 (7th Cir. 2020)...............................................................*passim*

*United States v. Story,*
  137 F.3d 518 (7th Cir. 1998)......................................................................12

*Walgren v. Howes,*
  482 F.2d 95 (1st Cir. 1973) .......................................................................34

*YMCA Vote at 18 Club v. Bd. of Elections of City of N.Y.,*
  319 F. Supp. 543 (S.D.N.Y. 1970) .............................................................24

CONSTITUIONAL AND STATUTORY PROVISIONS

U.S. Const. art. I, § 4 ......................................................................... 26, 29

U.S. Const. amend. XV, § 1 ....................................................................36

## CONSTITUIONAL AND STATUTORY PROVISIONS [CONT'D]

U.S. Const. amend. XIV ..................................................................*passim*

U.S. Const. amend. XV ................................................... 30, 31, 36

U.S. Const. amend. XV, § 1 ..................................................36

U.S. Const. amend. XIX ...........................................................31

U.S. Const. amend. XXIV ........................................................31

U.S. Const. amend. XXVI ...................................................*passim*

U.S. Const. amend. XXVI, § 1 ........................................ 3, 19, 45

52 U.S.C. § 10301(a) ...............................................................37

52 U.S.C. § 10301(b) .........................................................*passim*

52 U.S.C. § 10502(b)–(f) .........................................................29

52 U.S.C. § 20101 .....................................................................42

52 U.S.C. § 20101(b)(2)(B)(ii) .................................................42

52 U.S.C. § 20107(2) ................................................................42

Ala. Code § 17-9-13(c)–(e) .......................................................42

Ala. Code § 17-9-30(d) .............................................................42

Ariz. Stat. § 16-581(B)(1) .........................................................41

Fla. Stat. § 97.0535(4)(a) ..........................................................42

Ga. Code § 21-2-381 ................................................................41

Ga. Code § 21-2-409.1 .............................................................42

Ind. Code § 1-1-1-8(a)–(b) .......................................................48

Ind. Code § 3-5-2-16.5 ...............................................................5

Ind. Code § 3-6-4.1-14 ...............................................................5

Ind. Code § 3-6-5-14 ..................................................................5

CONSTITUIONAL AND STATUTORY PROVISIONS [CONT'D]

Ind. Code § 3-7-13-1 ..............................................................4

Ind. Code § 3-11-4-1 ......................................................*passim*

Ind. Code § 3-11-4-1(c) .........................................................5

Ind. Code § 3-11-4-1(c)–(d) ...................................................6

Ind. Code § 3-11-4-2 ..............................................................6

Ind. Code § 3-11-4-17.5 .........................................................6

Ind. Code § 3-11-8-2 ............................................... 2, 4, 21, 48

Ind. Code § 3-11-10-24 ......................................................2, 7

Ind. Code § 3-11-10-24(a) .................................... 39, 41, 48

Ind. Code § 3-11-10-24(a)(5) ..............................................48

Ind. Code § 3-11-10-24(a)–(b) .......................... 4, 5, 21, 48

Ind. Code § 3-11-10-25 ..........................................................4

Ind. Code § 3-11-10-26 ................................... 4, 21, 39, 48

Ind. Code § 3-11.5-4-11 .........................................................6

Ind. Code § 3-11.5-4-12 .........................................................6

Ind. Code § 3-14-2-16(9)–(10) .............................................5

Ky. Rev. Stat. § 117.085 ......................................................41

La. Rev. Stat. § 1303(J) .......................................................41

Mich. Comp. L. § 28.292 .....................................................42

Mich. Comp. L. § 168.758 (1996) ......................................41

Miss. Code § 23-15-715 .......................................................41

Mo. Stat. § 115.277(6)(1) (2020) .......................................41

N.C. Gen. Stat. § 163-166.9 ................................................41

CONSTITUIONAL AND STATUTORY PROVISIONS [CONT'D]

R.I. Stat. § 17-19-51 ................................................................42

S.C. Code § 7-15-320 ...............................................................41

Tenn. Code § 2-6-201(5)(A) ......................................................41

Tex. Elec. Code § 82.003 ..........................................................41

Va. Code § 24.2-416.1 (2004) ...................................................41

W. Va. Code § 3-3-1(b)(1)(B) ....................................................41

Voting Rights Act Amendments of 1970,
    Pub. L. No. 91-285, 84 Stat. 314 ........................................25

1993 Ind. Legis. Serv. P.L. 3-1993, § 124 ............................ 39, 48

2005 Ind. Legis. Serv. P.L. 103-2005 ..........................................5

LEGISLATIVE MATERIALS

H.R. Rep. No. 97-227 (1981) ....................................................30

S. Rep. No. 92-26 (1971) ................................................ 3, 26, 28

S. Rep. No. 97-417 (1982) ................................................. 29, 30

117 Cong. Rec. 5,815 (1971) .....................................................26

117 Cong. Rec. 5,826 (1971) .....................................................26

117 Cong. Rec. 7,533 (1971) .....................................................27

117 Cong. Rec. 7,538 (1971) .....................................................26

Sen. Birch Bayh, S. Comm. on the Judiciary, 92d Cong., *Passage and
    Ratification of the Twenty-Sixth Amendment* (Comm. Print 1971) ................. 3, 26

House Comm. on Elections, Bill Analysis, S.B. 1047, 64th Leg., R.S.
    (1975), https://lrl.texas.gov/LASDOCS/64R/SB1047/SB1047_64R.pdf
    #page=82 ..........................................................................41

**OTHER AUTHORITIES**

*The American Heritage Dictionary* (1980) ........................................................ 19, 35, 36

1 *An Analysis of Laws and Procedures Governing Absentee Registration
and Absentee Voting in the United States*, Ind. Univ. Sch. of Pub. &
Env. Affairs (1975) ................................................................................................ 24, 25

Note, *The Submerged Constitutional Right to an Absentee Ballot*, 72
Mich. L. Rev. 157 (1973) ...................................................................................... 24, 39

*Webster's Third New International Dictionary* (1986) .................................. 19, , 35, 36

18B C. Wright & A. Miller, *Federal Practice & Procedure Jurisdiction*
(3d ed.) .................................................................................................................... 17

## INTRODUCTION

This Court has already rejected plaintiffs' theory that the Twenty-Sixth Amendment requires Indiana to indulge their preference for voting by mail even though nothing prevents them from voting in person. In *Tully v. Okeson*, 977 F.3d 608 (7th Cir. 2020), *cert. denied* 141 S. Ct. 2798 (2021), this Court rejected plaintiffs' bid for a preliminary injunction requiring the "radical" reform of "unlimited" mail-in voting. 977 F.3d at 618. It held that Indiana "d[id] not violate the Constitution" by allowing the "elderly" and other voters with a valid excuse to vote by mail, but not extending the same accommodation to voters without a valid excuse. *Id.* at 611. The "right to vote," the Court explained, "means the ability to cast a ballot"—"not the right to do so in a voter's preferred manner, such as by mail." *Id.* at 613. Therefore, "unless a state's actions make it harder to cast a ballot at all, the right to vote is not at stake." *Id.* at 611; *see also id.* at 619 (Ripple, J., concurring) (explaining the Twenty-Sixth Amendment allows Indiana to "remove[]" an "impediment[]" for "senior citizens").

Under law-of-the-case doctrine and *stare decisis* principles, this Court's unequivocal holding that "Indiana's absentee-voting regime . . . does not violate the Constitution" controls "on [this] second appeal." *Kaku Nagano v. Brownell*, 212 F.2d 262, 263 (7th Cir. 1954); *see Tully*, 977 F.3d at 611. Plaintiffs say law-of-the-case principles do not apply to preliminary-injunction-stage rulings. That is incorrect. And plaintiffs identify no substantial new facts, legal arguments, or intervening precedents that warrant a different outcome. As the district court ruled, plaintiffs press "arguments [that] were raised before the Seventh Circuit but did not carry the day." SA13.

## JURISDICTIONAL STATEMENT

Plaintiffs' amended jurisdictional statement is complete and correct.

## STATEMENT OF THE ISSUES

Indiana law permits all registered voters to vote in-person on election day or in advance. Ind. Code §§ 3-11-4-1, 3-11-8-2. To accommodate some disadvantaged voters—including voters absent from their county on election day, voters confined due to illness, and "elderly voter[s]"—Indiana law gives them the option of voting by mail. *Id.* § 3-11-10-24. Plaintiffs are voters who would "prefer to vote by mail," but do not expect to qualify for mail-in ballots. ECF No. 112 at 1. The questions are:

1.    Whether this Court's holding in *Tully v. Okeson*, 977 F.3d 608 (7th Cir. 2020), that "Indiana's absentee-voting regime does not affect Plaintiffs right to vote and does not violate the Constitution" is law of the case.

2.    Whether Indiana's absentee-voting regime denies or abridges plaintiffs' right to vote on account of age in violation of the Twenty-Sixth Amendment.

## STATEMENT OF THE CASE

### I.    Legal Background

#### A.    The Twenty-Sixth Amendment

Under the U.S. Constitution, States have "'broad powers to determine the conditions under which the right of suffrage may be exercised.'" *Shelby Cnty. v. Holder*, 570 U.S. 529, 543 (2013) (quoting *Carrington v. Rash*, 380 U.S. 89, 91 (1965)). For most of this Nation's history, States have generally required voters to be at least 21 years old and to vote in person on election day. *See Tex. Democratic Party v. Abbott*, 978 F.3d 168, 185 (5th Cir. 2020) (*TDP*); S. Rep. No. 92-26, at 7 (1971). The national

voting age was lowered to 18 only with the Twenty-Sixth Amendment's ratification in 1971. That amendment provides that the "right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI, § 1.

The Twenty-Sixth Amendment represents a response to partial invalidation of the Voting Rights Act Amendments of 1970 and political pressures to enfranchise 18-year-old citizens. *See* Sen. Birch Bayh, S. Comm. on the Judiciary, 92d Cong., *Passage and Ratification of the Twenty-Sixth Amendment* 4–16 (Comm. Print 1971). In the 1970 Amendments, Congress had attempted to lower the voting age to 18 by statute despite warnings from William H. Rehnquist, Alexander M. Bickel, Robert H. Bork, and John Hart Ely that a statute would not pass constitutional muster. *See id*. at 7–8. In *Oregon v. Mitchell*, 400 U.S. 112 (1970), the Supreme Court held the statutory provision lowing the voting age unconstitutional as to state and local elections and constitutional as to federal elections. *See id*. at 117–18 (opinion of Black, J.).

The ruling threatened chaos for the 47 States that did not let 18-year-olds vote. *See* S. Rep. No. 92-26, at 7, 11 (1971). As the Senate Committee on the Judiciary observed, different voting ages for federal and state elections would cause "substantial nationwide confusion, delay, and danger of fraud." *Id*. at 12. There was even doubt about whether States could implement a system of dual-age voting before the upcoming 1972 election—a process that would entail "enormous" costs and "'intolerable'" administrative burdens besides. *Id*. at 14–15. Congress accordingly proposed, and the

3

States ratified, the Twenty-Sixth Amendment more quickly than any other constitutional amendment. *See TDP*, 978 F.3d at 185–88.

Although the Twenty-Sixth Amendment prohibited States from denying or abridging the "right to vote," it did not alter the baseline requirement of in-person voting on election day. States continued to require "nearly all voters to cast their ballots in person on election day and allowed only narrow and tightly defined categories of voters to cast absentee ballots." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2339 (2021). "As of January 1980"—nine years after the Amendment's ratification—"only three States permitted no-excuse absentee voting." *Id.*

### B.     Indiana election law

Consistent with the Twenty-Sixth Amendment, Indiana permits all citizens who are "at least eighteen (18) years of age" to register as voters. Ind. Code § 3-7-13-1. To vote, all registered voters may cast ballots in-person at their precinct polling places on election day, *id.* § 3-11-8-2, or—using a procedure sometimes called absentee in-person voting—may cast ballots in-person at various locations for the 28 days prior to election day, *id.* §§ 3-11-4-1, 3-11-10-26. Additionally, voters who cannot vote in person on election day due to "illness or injury," caring for someone at a private residence, or disability, may vote via a travelling voter board, which will bring a ballot to the voter's house and then return it for counting. *Id.* § 3-11-10-25.

Mail-in voting is permitted only where a voter meets one of several different criteria. *See* Ind. Code § 3-11-10-24(a)–(b). Qualifying circumstances include:

- having "a specific, reasonable expectation of being absent from the county on election day during the entire twelve (12) hours that polls are open,"

- being "confined on election day . . . because of an illness or injury during the entire twelve (12) hours that polls are open,"

- being scheduled to "work . . . during the entire twelve (12) hours that polls are open,"

- being disabled,

- being "elderly," *i.e.*, "at least sixty-five (65) years of age."

*Id.*; *see id.* § 3-5-2-16.5.

Due to the ever-present threat of fraud and coercion attendant to mail-in voting, Indiana strictly regulates the mail-in voting process. It restricts who may handle printed or completed absentee ballots, deeming it a level 6 felony for anyone other than a select group of individuals to possess absentee ballots. *See* Ind. Code § 3-14-2-16(9)–(10). Those restrictions were added shortly after a highly publicized East Chicago mayoral election scandal involving absentee ballot fraud. *See* 2005 Ind. Legis. Serv. P.L. 103-2005; *Pabey v. Pastrick*, 816 N.E.2d 1138, 1145–47 (Ind. 2004).

Responsibility for administering Indiana election law is divided between the Indiana Election Commission and county election boards. The Indiana Election Commission is charged with "[a]dminister[ing] Indiana election laws," adopting rules to "[g]overn the fair, legal, and orderly conduct of elections," and supervising local election officials. Ind. Code § 3-6-4.1-14. It may (among other things) authorize voters to cast absentee ballots where "an emergency prevents the person from voting in person at a polling place." *Id.* § 3-11-4-1(c). County election boards are charged with "[c]onduct[ing]" elections, "administer[ing] the election laws within the county," and preparing and distributing ballots. *Id.* § 3-6-5-14. Their responsibilities include deciding

whether absentee-ballot applications, *id.* §§ 3-11-4-2, 3-11-4-17.5, and returned absentee ballots, *id.* §§ 3-11.5-4-11, 3-11.5-4-12, meet all legal requirements.

### C.     Indiana's response to COVID-19 for the 2020 primary

In March 2020, shortly after the outbreak of COVID-19, the Indiana Election Commission issued an emergency order under Indiana Code § 3-11-4-1(c)–(d) that afforded "[a]ll registered and qualified Indiana voters . . . the opportunity to vote no-excuse absentee by mail" during the 2020 primary election. ECF No. 53-8 at 2. The Commission did not make similar accommodations for future elections.

Permitting universal voting by mail in the 2020 primary election caused many counties to experience challenges processing the much larger volume of mail-in absentee ballots. In the 2020 primary, for example, Lake County "sent voters 31,704 absentee-by-mail ballots"—nearly 10 times its usual volume. ECF No. 53-1 at ¶¶ 4–10. Hendricks County "sent 10,152 absentee-by-mail ballots, as compared to 1,323 during the 2016 primary election." ECF No. 53-2 at ¶¶ 4–10. Hamilton County sent "approximately 40,000 absentee-by-mail ballots, as compared to approximately 3,000 during the 2016 primary election." ECF No. 53-3 at ¶¶ 4–11.

That surge in mail-in absentee ballots caused many counties to incur additional, unintended costs, such as costs of hiring personnel to process and count the mail-in votes, purchasing postage to mail the ballots, and installing safety measures to store the absentee ballots securely. *See* ECF No. 53-1 at ¶ 5 (Lake County "required additional part-time staff and overtime for full-time staff," which costed "approximately $11,275," and spent "$38,046 in postage"); ECF No. 53-2 at ¶¶ 4–5, 10

6

(Hendricks County had to hire "twenty additional staff members for the sole purpose of canvasing the vote," and spent "$12,444 in postage alone" for absentee-by-mail applications and "an additional $19,427" for absentee-by-mail ballots); ECF No. 53-3 at ¶¶ 7–8 (in Hamilton County, "approximately twice as many staff members were required to process absentee-by-mail ballots," and the 2020 primary "was the first time [the county] had to continue canvasing the vote on the following day").

Additionally, numerous absentee-by-mail ballots were not counted due to human error that could easily have been avoided in the in-person voting context: Sometimes election officials failed to initial the ballot before sending it to the voter, and many voters forgot to sign their ballots. *See* ECF No. 53-3 at ¶ 11. And, of course, the United State Postal Service's unpredictable processing caused many ballots to arrive late, both to the voter and on return to the local election board—meaning that many mail-in ballots arrived after the deadline and could not be counted. *See* ECF No. 53-1 at ¶ 8; ECF No. 53-2 at ¶ 5; ECF No. 53-3 at ¶ 9.

## II.    Procedural Background

In April 2020, several Indiana voters and a non-profit organization that seeks universal mail-in voting challenged Indiana's voting procedures. ECF No. 1. They alleged that Indiana Code § 3-11-10-24—which permits some but not all voters to cast ballots by mail—violates the Fourteenth Amendment's Equal Protection Clause "as applied during the pandemic." *Id.* ¶¶ 66–82. Plaintiffs also alleged that Indiana law violates the Twenty-Sixth Amendment by permitting the "elderly" to vote by mail without extending the same privilege to non-elderly voters. ECF No. 6 ¶¶ 84–94.

## A.     Preliminary-injunction proceedings

The district court denied plaintiffs' request for a preliminary injunction decreeing "unlimited" mail-in voting for the 2020 general election, holding they were unlikely to succeed on the merits. ECF No. 72 at 15. By its terms, the court observed, the Twenty-Sixth Amendment protects only "the right . . . to vote." *Id.* at 16. And under *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969), "a restriction on absentee voting does not endanger the right to vote unless it 'absolutely prohibit[s]' someone from voting." *Id.* (quoting *McDonald*, 394 U.S. at 807). Plaintiffs, however, did "not contend that they are absolutely prohibited from voting." *Id.* at 8. This case was thus not about "the right to vote . . . but a claimed right to receive absentee ballots"—a privilege that Indiana has "wide leeway" to regulate. *Id.* (quoting *McDonald*, 394 U.S. at 807). And in the court's view, Indiana had reasonably drawn distinctions that survived Fourteenth Amendment scrutiny. *Id.* at 10–11.

At bottom, the court observed, plaintiffs sought to have federal courts decide "political question[s]" about how broadly to permit mail-in voting and how to safeguard public health during COVID-19. ECF No. 72 at 13. But binding precedent "foreclosed that sort of substitution of judicial judgment for legislative judgment." *Id.* (quoting *Luft v. Evers*, 963 F.3d 665, 671 (7th Cir. 2020)). Further, the court observed, judicially decreeing universal mail-in voting for the general election could "easily strain Indiana's voting systems," increase the risk that voters will cast "late or defective ballots," and "jeopardize" "accurate and timely" reporting of results. *Id.* at 14–15.

**B.     Appellate proceedings**

This Court affirmed the denial of the preliminary injunction, holding that "Indiana's absentee-voting regime does not affect Plaintiffs' right to vote and does not violate the Constitution." *Tully v. Okeson*, 977 F.3d 608, 611 (7th Cir. 2020). It perceived that the "success of [Plaintiffs'] claim depends on whether Indiana's age-based absentee-voting law abridges 'the right . . . to vote' protected by the Twenty Sixth Amendment or merely affects a privilege to vote by mail." *Id.* at 613. And it held that the "Supreme Court [had] answered this question" in Indiana's favor. *Id.*

In *McDonald*, the Supreme Court confronted a state law "granting absentee ballots to some individuals, but not pretrial detainees." *Tully*, 977 F.3d at 613. Although the law "'ma[de] voting more available to some groups,'" it did not "'absolutely prohibit[]' [pretrial detainees] from voting." *Id.* (quoting *McDonald*, 394 U.S. at 807, 808 n.7). As a result, the Supreme Court concluded, "it was 'not the right to vote that [was] at stake . . . but a claimed right to receive absentee ballots.'" *Id.* (quoting *McDonald*, 394 U.S. at 807). "In short, the [Supreme] Court held that the fundamental right to vote means the ability to cast a ballot, but not the right to do so in a voter's preferred manner, such as by mail." *Id.*

That principle disposed of plaintiffs' claim. In this case, this Court explained, Indiana law "make[s] voting more available to some groups," including "voters over sixty-five." *Tully*, 977 F.3d at 614. Indiana law, however, "does not 'impact [Plaintiffs'] ability to exercise the fundamental right to vote' or 'absolutely prohibit [Plaintiffs] from voting." *Id.* (quoting *McDonald*, 394 U.S. at 807, 808 n.7). "If Indiana's law

9

granting absentee ballots to elderly voters changed or even disappeared tomorrow, all Hoosiers could vote in person this November, or during Indiana's twenty-eight-day early voting window, just the same." *Id.* "Consequently, 'at issue [i]s not a claimed right to vote' but a 'claimed right to an absentee ballot.'" *Id.* (quoting *McDonald*, 394 U.S. at 807).

This Court rejected arguments that its reliance on *McDonald* was inconsistent with original meaning, precedent since *McDonald*, or the Twenty-Sixth Amendment's relationship to other constitutional provisions. *Tully*, 977 F.3d at 613–14. It observed that *McDonald*, decided in 1969, "certainly assist[s]" understanding "what the right to vote meant at the time the Twenty-Sixth Amendment was ratified in 1971." *Id.* at 613 (quoting *Tex. Democratic Party v. Abbott*, No. 20-50407, 2020 WL 5422917 (5th Cir. Sept. 10, 2020), *opinion withdrawn and superseded*, 978 F.3d 168 (5th Cir. 2020)). It noted that the Supreme Court has "reiterated [*McDonald*'s] holding several times." *Id.* at 613 n.3; *see id.* ("[O]ther federal courts of appeals have continued to acknowledge *McDonald*'s authority."). And this Court explained the relationship between the various constitutional provisions that govern voting. *See id.* at 614.

This Court rejected plaintiffs' Fourteenth Amendment theory as well. *Tully*, 977 F.3d at 615–618. Applying rational-basis scrutiny, the Court observed that "Indiana has an undeniably legitimate interest in preventing voter fraud and 'other abuses' that are 'facilitated by absentee voting.'" *Id.* at 616 (quoting *Griffin v. Roupas*, 385 F.3d 1128, 1130–31 (7th Cir. 2004)). And limiting "absentee voting only to those

10

Hoosiers who are most likely to benefit from it bears a clearly rational relationship to that interest in curbing the dangers of unfettered absentee voting." *Id.* at 616–17.

This Court further ruled that Indiana's mail-in voting statute would survive even if the *Anderson-Burdick* framework dictated heightened scrutiny. *Id.* at 617–18. "[M]indful that Indiana's decision to accommodate some voters by permitting absentee voting 'is an indulgence—not a constitutional imperative'"—the Court explained, "Indiana's legitimate interests in ensuring safe and accurate voting procedures are sufficient to outweigh any limited burden on Hoosiers' right to vote as they choose." *Id.* (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 209 (2008) (Scalia, J., concurring)). The "radical" reform of "unlimited absentee voting" cannot be decreed "in the name of the Constitution where the State has infringed on no one's right to vote." *Id.* at 618 (quotation marks and citation omitted).

Judge Ripple concurred. In his view, plaintiffs' Twenty-Sixth Amendment claim was "weak" because Indiana law "employs age only in a tangential way." *Tully*, 977 F.3d at 619 (Ripple, J., concurring). "It simply defines the term 'elderly' as a person who has lived sixty-five years" to relieve "the Commission of the insurmountable task of adjudicating, on an individual basis, which of its older citizens would be deterred in coming to the polls on a November day because of the physical and social conditions that invariably afflict senior citizens." *Id.* "By granting a general absentee voting privilege to its senior citizens," Judge Ripple explained, the State simply "removed for its senior citizens impediments not experienced by most other Hoosiers who desire to vote." *Id.* "This is hardly an invidious classification based on age." *Id.*

Judge Ripple deemed plaintiffs' Fourteenth Amendment claim "somewhat stronger" but "hardly" robust. *Tully*, 977 F.3d at 620 (Ripple, J., concurring). Plaintiffs, he observed, "cannot show any realistic jeopardy of losing the right to vote because of [Indiana's] decision not to extend the absentee ballot privilege," and that decreeing universal mail-in voting would create "significant difficulty" for the State. *Id.*; *see id.* (observing that no evidence showed the State had "the infrastructure necessary to handle a significantly greater number of ballots in the general election").

The Supreme Court denied certiorari. *Tully v. Okeson*, 141 S. Ct. 2798 (2021).

## C.     Remand proceedings

On remand, plaintiffs voluntarily dismissed their Fourteenth Amendment claim, ECF No. 99, and both sides moved for summary judgment on the remaining Twenty-Sixth Amendment claim, SA4. The district court ruled for the State. SA5.

The court deemed this Court's decision rejecting plaintiffs' Twenty-Sixth Amendment theory controlling under law-of-the-case principles and a district court's "duty to follow Seventh Circuit precedent." SA9, SA15. "Generally, under the law of the case doctrine, when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." SA9 (quoting *United States v. Story*, 137 F.3d 518, 520 (7th Cir. 1998)). And as the district court explained, this Court's decision in *Tully* "squarely addressed and clearly resolved the legal issues" raised on summary judgment. SA10. "The parties d[id] not rely on any discovery or record evidence in their briefs," designate any "'substantial new evidence,'" or raise substantial new legal arguments. SA9 (citation omitted); *see* SA13.

12

"[T]he bulk of Plaintiffs' arguments about the Twenty-Sixth Amendment's meaning were raised to the Seventh Circuit but did not carry the day." SA13.

The district court rejected plaintiffs' argument that rulings on preliminary injunctions cannot be law of the case. SA10–SA12. Under Seventh Circuit precedent, the court observed, lower courts "have 'no authority to revisit' issues resolved in an appeal" concerning a "preliminary injunction" where pure issues of law are involved and no law-of-the-case exception applies. SA12 (quoting *Pearson v. Edgar*, 153 F.3d 397, 405 (7th Cir. 1998)). The district court also rejected plaintiffs' argument that *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021)—a decision construing the statutory requirement that elections be "equally open to participation" by a protected class, 52 U.S.C. § 10301(b)—undermined this Court's decision. SA13–SA14. *Brnovich*, the district court observed, did not address the Twenty-Sixth Amendment, "*McDonald*'s application," or any premise undergirding *Tully*. *Id.*

## SUMMARY OF THE ARGUMENT

The district court correctly rejected plaintiffs' claim that the Twenty-Sixth Amendment forbids Indiana from allowing the elderly—citizens needing special accommodations—to vote by mail without also allowing everyone else to vote by mail.

I.     The Court should adhere to its earlier ruling in this case that Indiana's "absentee-voting regime does not affect Plaintiffs' right to vote and does not violate the Constitution." *Tully v. Okeson*, 977 F.3d 608, 611 (7th Cir. 2020). Under the law-of-the-case doctrine and *stare decisis* principles, an earlier decision from this Court resolving a legal issue controls in a second appeal in the same case.

No exception to the law-of-the-case doctrine applies. Although *Tully* arose in the preliminary-injunction context, the Court fully considered plaintiffs' legal arguments. No intervening factual or legal developments undermine *Tully*'s holding that Indiana law comports with the Constitution. And there is no clear error in *Tully*.

II.     This Court's holding that Indiana law does not impact the "right . . . to vote" secured by the Twenty-Sixth Amendment is correct. That Amendment reflects the Supreme Court's holding in *McDonald v. Board of Election Commissions of Chicago*, 394 U.S. 802 (1969), that the "right to vote" does not include a "right to receive absentee ballots" unless a citizen is absolutely prohibited from voting. *Id.* 807. Plaintiffs, who can still vote in person, therefore do not have a right to vote by mail.

History confirms that there is no right to vote by mail where a person is not precluded from voting. When the Twenty-Sixth Amendment was adopted, almost everyone was required to vote in person on election day. There was no recognized "right" to no-excuse, mail-in voting. The Amendment's origins, moreover, show that it was adopted to lower the voting age to 18—not redefine the "right to vote." The snippets of legislative history plaintiffs invoke do not alter that conclusion.

Precedent, too, recognizes there is no right to vote by mail. Plaintiffs cite no decision holding the "right to vote" requires States to indulge a citizen's preference for voting by mail where other voting methods remain available.

III.     As the Fifth Circuit recently made clear in upholding a law similar to Indiana's, Indiana law does not "abridge[]" plaintiffs' right to vote regardless. To "abridge" the right to vote means to make voting harder. The concept of abridgment

14

does not require States to relieve voters of the usual burdens of voting or prohibit every distinction that makes it easier for some group to vote.

By allowing elderly voters to vote by mail, Indiana made it easier for them to vote. Indiana, however, did not make it harder for anyone else to vote. In fact, plaintiffs have greater opportunity to vote now that they would have had at the time of the Twenty-Sixth Amendment's ratification in 1971. No one's right has been abridged.

Historical practice confirms that Indiana's absentee-voting regime passes muster. States and the federal government have long made accommodations for the elderly in voting. Those laws reflect that older voters face challenges that younger voters do not. Removing obstacles to voting for the elderly is hardly invidious.

Plaintiffs offer no reason to reach a different conclusion. The cases they cite do no condemn efforts to make it easier to vote. And while offering the elderly opportunities to vote by mail serves legitimate state interests in removing obstacles to voting, other interests favor restricting mail-in voting to those who need it.

The radical reform plaintiffs seek of unlimited mail-in voting must come through the political process, not the judiciary.

## ARGUMENT

The Constitution primarily entrusts States with the delicate, "difficult" task of "balancing the competing interests involved in the regulation of elections." *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004). Indiana balances those many interests—from "discouraging fraud" to "managing administrative capacity" to "ensuring that the maximum number of ballots are deemed valid"—by allowing all registered voters

to vote in person on election day or during early voting, and by restricting voting by mail to those who need special accommodations (*e.g.*, the elderly, the disabled, the sick). *Tully v. Okeson*, 977 F.3d 608, 616 (7th Cir. 2020).

As this Court held when this case was last before it, Indiana's "absentee-voting regime does not affect Plaintiffs' right to vote and does not violate the Constitution." *Tully*, 977 F.3d at 611. Plaintiffs have not been denied the ability to cast a ballot or been subjected to any greater hardship than American voters have faced since the Republic's founding. That Indiana makes it easier for the elderly and others who need special accommodations to vote does not mean it must now entertain plaintiffs' preference to vote without leaving home. Mail-in voting "'is an indulgence—not a constitutional imperative that falls short of what is required.'" *Id.* at 618 (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 209) (Scalia, J., concurring)).

<u>Standard of Review</u>. The district court's grant of summary judgment is reviewed de novo. *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017).

## I.    This Court's Decision Rejecting Plaintiffs' Twenty-Sixth Amendment Theory Controls

The district court correctly held that "both the law of the case doctrine" and "Seventh Circuit precedent" foreclose plaintiffs' claim. SA15. In *Tully v. Okeson*, 977 F.3d 608 (7th Cir. 2020), this Court held that "Indiana's absentee-voting regime does not affect Plaintiffs' right to vote and does not violate the Constitution." *Id.* at 611. It specifically rejected plaintiffs' theory that the Twenty-Sixth Amendment requires "unlimited" mail-in voting because Indiana allows elderly citizens to vote by mail, explaining that the "right to . . . vote" does not encompass a right to vote "in a voter's

preferred manner, such as by mail." *Id.* at 613, 618. That holding controls here: Under law-of-the-case principles, "matters decided on appeal become the law of the case to be followed in all subsequent proceedings in the trial court and, on second appeal, in the appellate court." *Kaku Nagano v. Brownell*, 212 F.2d 262, 263 (7th Cir. 1954); *see, e.g.*, *Rothner v. City of Chicago*, 929 F.2d 297, 301 (7th Cir. 1991). "Litigation would be unduly prolonged if every dissatisfied litigant were permitted to renew on successive appeals questions previously considered and decided." *Kaku*, 212 F.2d at 263.

Plaintiffs object that *Tully* was a "preliminary injunction decision." Br. 28. But it is hornbook law that "a fully considered appellate ruling on an issue of law made on a preliminary injunction appeal . . . become[s] the law of the case for further proceedings . . . on remand and in any subsequent appeal." 18B C. Wright & A. Miller, *Federal Practice & Procedure Jurisdiction* § 4478.5 (3d ed.); *see, e.g.*, *Fish v. Schwab*, 957 F.3d 1105, 1141 (10th Cir. 2020); *Sherley v. Sebelius*, 689 F.3d 776, 782–83 (D.C. Cir. 2012); *Howe v. City of Akron*, 801 F.3d 718, 740 (6th Cir. 2015). Thus, in *Pearson v. Edgar*, 153 F.3d 397 (7th Cir. 1998), a preliminary-injunction decision on a legal issue "established the law of the case." *Id.* at 401–02, 405; *see also Miller Brewing Co. v. Joseph Schlitz Brewing Co.*, 605 F.2d 990, 993 (7th Cir. 1979). And while plaintiffs observe that *Tully* was expedited, Br. 29, *Tully* nowhere says that prevented full consideration. Plaintiffs' arguments simply "did not carry the day." SA13.

Nor does *Tully* suggest plaintiffs might have won but for seeking relief on the "'eve of an election.'" Br. 29. Although *Tully* observed that "the *Purcell* principle counsels federal courts to exercise caution and restraint before upending state election

17

regulations on the eve of an election," 977 F.3d at 611–12, the "case was ultimately decided on other grounds," *Common Cause Ind. v. Lawson*, 978 F.3d 1036, 1042 (7th Cir. 2020). This Court perceived that plaintiffs' "claims hinge on one question: what is the 'right to vote.'" *Tully*, 977 F.3d at 611. And deeming *McDonald* to have "answered this question," this Court held that plaintiffs' had no right to vote "by mail." *Id.* at 611, 613–14; *see Common Cause Ind. v. Lawson*, 977 F.3d 663, 664 (7th Cir. 2020) (describing *Tully* as holding "there is no constitutional right to vote by mail"). "Indiana's absentee-voting regime," this Court ruled, "does not affect Plaintiffs' right to vote and does not violate the Constitution." *Tully*, 977 F.3d at 611. In short, *Tully* "'unambiguously held that the claim failed as a matter of law.'" Br. 30 n.9.

*Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021), does not constitute an intervening change of law "'inconsistent with'" *Tully*. Br. 31. Plaintiffs argue that *Brnovich* "implied" absentee voting implicates the right to vote, notwithstanding *McDonald*. Br. 14, 32. As the district court observed, however, *Brnovich* did not address the Twenty-Sixth Amendment or the meaning of "right to vote." SA13. It construed the requirement in § 2 of the Voting Rights Act (VRA) that "'the political processes leading to nomination or election'" be "'equally open'" to a protected class and that the class have equal "'opportunity'" to elect representatives. *Brnovich*, 141 S. Ct. at 2337 (quoting 52 U.S.C. § 10301(b)). And lower courts lack the "prerogative" to assume that the Supreme Court "overruled" *McDonald*—a cornerstone of *Tully*—

18

"by implication." *Agostini v. Felton*, 521 U.S. 203, 237 (1997); *see Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("Th[e Supreme] Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.").

That leaves plaintiffs' argument that *Tully* is "clearly erroneous." Br. 33. For a decision "'to be clearly erroneous,' it must be 'more than just maybe or probably wrong; it must' strike 'with the force of a five-week-old unrefrigerated dead fish.'" *Rothner*, 929 F.2d at 301 n.6. And for the reasons below, there is no error, clear or otherwise, in *Tully*'s holding that Indiana law is constitutional.

## II. This Court's Earlier Ruling That the Twenty-Sixth Amendment's "Right To Vote" Does Not Encompass Mail-In Voting Is Correct

Plaintiffs claim that Indiana election law violates the Twenty-Sixth Amendment by not indulging their "prefer[ence] to vote by mail," even though plaintiffs could vote in person on election day or during Indiana's 28-day early-voting window. ECF No. 112 at 1; *see* Br. 13. By its terms, however, the Twenty-Sixth Amendment protects only the "right . . . to vote." U.S. Const. amend. XXVI, § 1. And the "right to vote means the ability to cast a ballot," "not the right to do so in a voter's preferred manner, such as by mail." *Tully v. Okeson*, 977 F.3d 608, 613 (7th Cir. 2020).

### A. As the U.S. Supreme Court held, refusing to indulge a preference for mail-in voting does not implicate the "right to vote"

The critical question is "what is 'the right to vote?'" *Tully*, 977 F.3d at 611. Around the time of the Twenty-Sixth Amendment's adoption, the term's core meaning was to "exercise a political franchise." *Webster's Third New International Dictionary* 2365 (1986); *see The American Heritage Dictionary* 1437 (1980) ("To express one's preference by a vote; cast one's vote"; "To express one's preference for; endorse by

19

vote"). It "does not follow" from that definition that the right includes a "right to vote *in any manner*." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (emphasis added).

    1.    Two years before the Twenty-Sixth Amendment's ratification, *McDonald v. Board of Election Commissions of Chicago*, 394 U.S. 802 (1969), confirmed that the right to vote "means the ability to cast a ballot"—not the right "to do so in a voter's preferred manner." *Tully*, 977 F.3d at 613. In *McDonald*, the Supreme Court rejected a claim by pretrial detainees that Illinois violated their "basic, fundamental right" to vote by not allowing them to vote absentee while allowing others—poll watchers, those away from the county, those observing a religious holiday, and the physically incapacitated—to do so. 394 U.S. at 806–10. Critically, "there [wa]s nothing to show" detainees were "absolutely prohibited from exercising the franchise." *Id.* at 809; *see id.* at 807, 808 n.7. Thus, the Court explained, the challenged law did not implicate "the right to vote . . . but a claimed right to receive absentee ballots." *Id.* at 807.

    Other cases decided shortly before and after the Twenty-Sixth Amendment's adoption "reiterate[]" *McDonald*'s understanding. *Tully*, 977 F.3d at 613 n.3. In *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626 n.6 (1969), *Bullock v. Carter*, 405 U.S. 134, 143 (1972), *Goosby v. Osser*, 409 U.S. 512, 521–22 (1973), *O'Brien v. Skinner*, 414 U.S. 524, 529–30 (1974), and *Hill v. Stone*, 421 U.S. 289, 300 n.9 (1975), the Supreme Court again distinguished between statutes that make "casting a ballot easier for some who are unable to come to the polls" (like Illinois's) and statutes that result in "an absolute denial of the franchise." *Kramer*, 395 U.S. at 626 n.6. It made clear that "not every limitation or incidental burden" resulting from state election

laws, *Bullock*, 405 U.S. at 143, "impact[s] . . . the[] right to vote," *Hill*, 421 U.S. at 300 n.9. Those decisions furnish weighty, contemporaneous evidence that the Twenty-Sixth Amendment secures the "ability to cast a ballot" only. *Tully*, 977 F.3d at 613.

That construction disposes of plaintiffs' challenge here. Indiana's law makes "'voting more available'" to groups that may have difficulty getting to the polls (*e.g.*, the disabled, the sick, and the elderly), allowing them to vote by mail. *Tully*, 977 F.3d at 614 (quoting *McDonald*, 394 U.S. at 807). But plaintiffs never aver that Indiana law will "absolutely prohibit[ them] from voting." *Id.* (quoting *McDonald*, 394 U.S. at 807). Plaintiffs, like "all Hoosiers," can "vote in person" on election day, "or during Indiana's twenty-eight-day early voting window." *Id.*; *see* Ind. Code §§ 3-11-4-1, 3-11-8-2, 3-11-10-26. And if plaintiffs happen to be away on election day, without transportation to the polls, or sick at home, they may vote by mail too. Ind. Code § 3-11-10-24(a)–(b). "Consequently, 'at issue [in this case] [i]s not a claimed right to vote' but a 'claimed right to an absentee ballot,'" which means plaintiffs' Twenty-Sixth Amendment claim fails. *Tully*, 977 F.3d at 614 (quoting *McDonald*, 394 U.S. at 807).

2.    Plaintiffs criticize this Court for looking to *McDonald* to understand what "the right to vote" means, observing that *McDonald* addressed a Fourteenth Amendment claim and involved a non-suspect classification. Br. 18–20. Whether or not those facts might distinguish *McDonald* for *stare decisis* purposes, however, they do not render *McDonald* irrelevant for purposes of understanding what "the right to vote" meant to those who ratified the Twenty-Sixth Amendment. *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 185 (5th Cir. 2020) (*TDP*). As the Fifth Circuit observed,

the Supreme Court's understanding of a constitutional concept—"the right to vote"— in 1969 "certainly assist[s]" in the search for "[u]nderstanding what the right to vote meant at the time the Amendment was ratified in 1971. *Id.*; *see Tully*, 977 F.3d at 613. "A definitive meaning of the right to vote . . . could hardly have been given any closer to the time the Amendment was ratified." *TDP*, 978 F.3d at 185.

Nor are plaintiffs correct that *McDonald* hinged on whether the challenged Illinois statute involved a non-suspect classification. *McDonald* rejected the detainees' constitutional challenge for "two" independent reasons—one of which was that "nothing in the record" demonstrated that "the Illinois statutory scheme has an impact on [their] ability to exercise the fundamental right to vote." 394 U.S. at 807. And the Court relied on that same rationale to reject a separate argument that Illinois's statutory scheme violated the detainees' right to vote on account of "indigency," even though *Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966), had held the right to vote cannot be conditioned upon wealth. *McDonald*, 394 U.S. at 808 n.7. Thus, the Court made plain that a statute does not implicate the "right to vote" where it merely impacts a "preferred manner" of voting. *Tully*, 977 F.3d at 613.

There also is no merit to plaintiffs' criticism that the Twenty-Sixth Amendment's plain meaning excludes *McDonald*'s view of the "right to vote." Br. 13, 18. The core meaning of the term "to vote" is to "exercise a political franchise," *see* pp. 19–20, *supra*; plaintiffs cite no alternative definition that encompasses *a choice* among methods. Plaintiffs instead observe that someone "who casts an absentee ballot is engaged

in 'voting.'" Br. 14. That statement is true enough. But its converse is not: "If Indiana's law granting absentee ballots . . . disappeared tomorrow," Hoosiers would not lack the right to vote. *Tully*, 977 F.3d at 614. They "could vote in person" on election day, "or during Indiana's twenty-eight-day early voting window, just the same." *Id.* The right to vote is the "ability to vote," not a "preferred method" of voting. *Id.* at 613.

Plaintiffs also quote decisions observing that "other Voting Amendments" generally secure "freedom from discrimination' in all 'matters affecting the franchise.'" Br. 13 (quoting *Lane v. Wilson*, 307 U.S. 268, 274 (1939)). As with any source, however, "'context is everything.'" *TDP*, 978 F.3d at 185. The cited decisions concern alleged impediments that affected citizens' ability to vote, *see, e.g.*, *Lane*, 307 U.S. at 271 (voting-registration requirement), or the significance of their vote, regardless of the method used. *City of Mobile v. Bolden*, 446 U.S. 55, 58 (1980) (plurality op.) (vote dilution). Those decisions' "general language" about voting should not be read apart from their immediate "context." *Illinois v. Lidster*, 540 U.S. 419, 424 (2004). Loose language cannot overturn *McDonald*'s express holding.

Finally, using *McDonald*, a Fourteenth Amendment case, to understand what the "right to vote" meant at the time of ratification does not deprive the Twenty-Sixth Amendment of "'independent meaning and force.'" Br. 19; *see* Br. 20. The Fourteenth and Twenty-Sixth Amendments after all secure the right to vote in different ways. *See Tully*, 977 F.3d at 614. The Fourteenth Amendment forbids "arbitrary" classifications, age-based or otherwise. *Am. Party of Tex. v. White*, 415 U.S. 767, 795 (1974). Absent the Twenty-Sixth Amendment, however, requiring voters to be 21 years old

would not raise an equal-protection problem. *See Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 51 (1959); *YMCA Vote at 18 Club v. Bd. of Elections of City of N.Y.*, 319 F. Supp. 543, 546 (S.D.N.Y. 1970). What the Twenty-Sixth Amendment does is lower the age at which citizens are permitted to exercise the franchise.

**B.    History supports this Court's holding that the "right to vote" does not protect a preference for mail-in voting**

1.    History points in the same direction as *McDonald*. When the Twenty-Sixth Amendment was ratified in 1971, only Maine permitted *any* registered voter to cast an absentee ballot. *See* Note, *The Submerged Constitutional Right to an Absentee Ballot*, 72 Mich. L. Rev. 157, 159 (1973). The remaining 49 States imposed various eligibility criteria, often requiring voters to be away from the precinct, county, city, or State on election day. *Id.* at 160–61. "[U]nder all except the most liberal statutes," the eligibility criteria were strict enough that "some qualified voters who [we]re not able to reach the polls" (*e.g.*, parents with sick children, people attending all-day business conferences, and jurors) would not qualify for absentee ballots. *Id.* at 161. And four States "restrict[ed] the[] use" of absentee ballots to "general elections." *Id.* at 160. "In-person voting was the rule, absentee voting the exception." *TDP*, 978 F.3d at 188.

Under the laws of many States, moreover, casting an absentee ballot was equivalent to early *in-person* voting. Many States required absentee ballots to be cast in person or required a "special absentee ballot committee to personally visit the voter." 1 *An Analysis of Laws and Procedures Governing Absentee Registration and Absentee Voting in the United States*, Ind. Univ. Sch. of Pub. & Env. Affairs 11 (1975). Not all States permitted absentee ballots to be returned by mail. *See id.* at 11, 92–

101. And even States permitting mail-in voting sometimes required the ballot to be cast before an official, a person authorized to administer oaths, or other witnesses. *See id.* at 92–101. States' universally restrictive voting regimes are strong evidence that the "right to vote" did not include plaintiffs' claimed right to unlimited, no-excuse, mail-in voting. *See Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259–60 (2022) (considering historical practices in rejecting a First Amendment claim).

In proposing the Twenty-Sixth Amendment, Congress and the ratifying States were aware of state restrictions on voting. *See TDP*, 978 F.3d at 186 & n.9. Yet Congress and the States did not adopt language redefining the "right to vote" to include a *choice* or *preference* among voting methods. Nor did the Twenty-Sixth Amendment usher in a sea-change for state laws, such as creating "a blanket right of registered voters to vote by absentee ballot." *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004). States continued to require "nearly all voters to cast their ballots in person on election day and allowed only narrow and tightly defined categories of voters to cast absentee ballots." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2339 (2021). "As of January 1980"—nine years after the Amendment's ratification—"only three States permitted no-excuse absentee voting." *Id.*

2.   The Twenty-Sixth Amendment's origins—its drafting history—provide further evidence that the "right to vote in 1971 di[d] not include a right to vote by mail." *TDP*, 978 F.3d at 188. The year before the Amendment's adoption, in the Voting Rights Act Amendments of 1970, Pub. L. No. 91-285, 84 Stat. 314, Congress had attempted to lower the voting age to 18 for *all* elections. In *Oregon v. Mitchell*, 400

25

U.S. 112 (1970), however, the Supreme Court held that Congress could lower the voting age for federal elections under Article I, § 4. *See id.* at 117–24 (opinion of Black, J.). But the Court held that "Congress cannot extend the franchise to 18-year-old citizens in state and local elections." *Id.* at 118 (opinion of Black, J.). The result was that *Mitchell* created a system under which 18-year-old voters in 47 States could vote in federal elections but not state or local elections. S. Rep. No. 92-26, at 11 (1971).

Congress proposed the Twenty-Sixth Amendment to overrule *Mitchell*. In proposing the amendment, members of Congress expressed alarm that the resulting system of dual-age voting would "create substantial nationwide confusion, delay, and danger of fraud." S. Rep. No. 92-26, at 12 (1971); *see, e.g.*, 117 Cong. Rec. 5,815 (Sen. Manfield) (1971); 117 Cong. Rec. 5,826 (Sen. Dole) (1971); 117 Cong. Rec. 7,538 (1971) (Rep. Michael). They also expressed concern that States would be unable to implement a system of dual age voting before the 1972 election—a move that would entail "enormous" expense. S. Rep. No. 92-26, at 15 (1971). A congressionally commissioned survey undertaken after *Mitchell* "concluded that a Federal constitutional amendment offered the only realistic hope in most States" of achieving a single-voting age before the 1972 election. Sen. Birch Bayh, S. Comm. on the Judiciary, 92d Cong., *Passage and Ratification of the Twenty-Sixth Amendment* 12 (Comm. Print 1971).

Whatever the validity of individual members' concerns, the origins of the Twenty-Sixth Amendment show that its point was to accomplish "what Congress tried but failed to do in 1970 in lowering the voting age for all elections." *TDP*, 978 F.3d at 186. It thus comes as little surprise that the Amendment "was the most

quickly ratified constitutional amendment in our history." *Id.* Had Congress and the States sought to overrule *McDonald*—a reform with "radical," wide-ranging implications for States' stringent restrictions on voting by mail—they surely would have adopted language redefining the "right to vote" to mandate no-excuse mail-in voting. *Tully*, 977 F.3d at 618. They would not have reused a term that, just two years earlier, the Supreme Court had held encompassed the "ability to cast a ballot, but not the right to do so in a voter's preferred manner, such as by mail." *Id.* at 613.

3.     Plaintiffs do not discuss state laws from the time of the Amendment's ratification. They instead point to two pieces of legislative history. First, they quote (at Br. 15) a floor statement from a single representative stating that "the term 'vote' includes all action necessary to make a vote effective . . . including, but not limited to registration or other action required by law prerequisite to voting and casting a ballot." 117 Cong. Rec. 7,533 (1971). Even setting aside that "floor statements by individual legislators rank among the least illuminating forms of legislative history," *NLRB v. S.W. Gen., Inc.*, 580 U.S. 288, 307 (2017), that statement is consistent with *Tully*'s holding that "the right to vote" means "the ability to cast a ballot," 977 F.3d at 613–14. Imposing a "prerequisite" to voting that results in "an absolute denial of the franchise" by any method is different from making "casting a ballot easier for some who are unable to come to the polls." *Kramer*, 395 U.S. at 626 n.6.

Second, plaintiffs quote (Br. 20) the Senate Committee on the Judiciary's remark that "forcing younger voters to undertake special burdens . . . in order to exercise their right to vote might well dissuade them from participating in the election."

S. Rep. No. 92-96, at 14 (1971). In the cited passage, however, the Committee did not purport to define the "right to vote" for purposes of the Twenty-Sixth Amendment—much less define it to include unfettered mail-in voting. The Committee was explaining the "purpose of the Voting Rights Act." *Id.* And far from suggesting that it would violate the Twenty-Sixth Amendment to require someone to vote in person absent a valid excuse, the Committee stated that requiring younger voters to "obtain[] absentee ballots" might constitute a "special burden[]." *Id.* A passing remark from a single committee hardly establishes that Congress and three-fourths of the States understood the Twenty-Sixth Amendment to secure a choice among preferred voting methods. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005).

The manifest concern of Congress and the States with reversing *Mitchell* further weakens plaintiffs' reliance on two (at best) ambiguous pieces of legislative history. True, the Twenty-Sixth Amendment's text cannot be limited to its "expected *application*[s]," Br. 8—a principle that applies with even greater force to the lines plaintiffs pluck from a floor statement and committee report, *see Exxon*, 545 U.S. at 586–69 (explaining reliance on committee reports "may give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both the power and the incentive to attempt strategic manipulations"). But the Twenty-Sixth Amendment's "historical context" is relevant for understanding the original public meaning of "right to vote." *Alden v. Maine*, 527 U.S. 706, 723 (1999) (considering that the Eleventh Amendment was adopted to overrule *Chisholm v. Georgia*, 2 U.S. (Dall.) 419 (1793)). The Amendment's origins confirm that Congress and the States sought to

28

reverse *Mitchell* without disturbing the prevailing understanding that the "right to vote in 1971 did not include a right to vote by mail." *TDP*, 978 F.3d at 188.

4. As a substitute for evidence from debates about the Twenty-Sixth Amendment itself, plaintiffs invoke the "1970 Amendments to the VRA" in which Congress created "'uniform national rules for absentee voting in presidential and vice-presidential elections.'" Br. 16. In creating those rules, however, Congress did not require States to allow mail-in absentee voting in *all* elections for *any* reason— the relief plaintiffs allege that the Twenty-Sixth Amendment affords them. The "only congressional insistence in the Voting Rights Act Amendments . . . was to give all voters *who were going to be absent on election day* a right to vote absentee for a presidential ticket." *TDP*, 978 F.3d at 187–88 (emphasis added); *see* 52 U.S.C. § 10502(b)–(f). The amendments—which the controlling opinion in *Mitchell* upheld under Congress's Article I, § 4 power to regulate the time, place, and manner of federal elections, *see* 400 U.S. at 134 (opinion of Black, J.)—are thus consistent with *McDonald*'s holding that the right to vote means the ability to vote. *See TDP*, 978 F.3d at 187–88.

Plaintiffs also invoke legislative history from 1982 concerning § 2 of the VRA Amendments of 1980. Br. 17. They quote a Senate committee report's observation that § 2 prohibits practices that "result in the denial of equal access to any phase of the electoral process." S. Rep. No. 97-417, at 30 (1982). That observation, however, simply reflects § 2's express prohibition on practices that result in the "political processes *leading to nomination or election* in the State or political subdivision" not being

"equally open" to a protected class. 52 U.S.C. § 10301(b) (emphasis added). It sheds no light on whether the "right to vote" is the right to vote via a preferred method.

Equally unilluminating is the footnote from the House committee report suggesting that it could violate § 2 to make "absentee ballots available to white citizens" but not "minority citizens similarly situated." H.R. Rep. No. 97-227, at 31 n.105 (1981). That footnote simply reflects that VRA § 2 prohibits the use of "political processes" that are "not equally open" to minority voters or that provide "less opportunity." 52 U.S.C. § 10301(b). And it would be "shoddy" craft to give a few members' unenacted views about § 2 any weight in searching for the "public meaning of an altogether different text." *Gamble v. United States*, 139 S. Ct. 1960, 1965 (2019).

In relying on VRA legislative history, moreover, plaintiffs mistakenly assume that every violation of the VRA denies or abridges the constitutional "right to vote." As the Supreme Court has made clear, however, VRA § 2 prohibits more conduct than the Constitution itself. *See Brnovich*, 141 S. Ct. at 2332 (explaining that Congress expanded VRA § 2 after the *City of Mobile v. Bolden*, 446 U.S. 55 (1980), plurality held it "added nothing to the protections afforded by the Fifteenth Amendment"). That is because the VRA § 2 was enacted under a combination of constitutional powers, including Congress's powers to enforce the Fourteenth Amendment's Equal Protection Clause. *See* S. Rep. No. 97-417, at 9 (1982). Thus, a "hypothetical law[] . . . restricting the ability of African Americans or women or the poor to vote by mail" might violate VRA § 2. *Tully*, 977 F.3d at 614. But any VRA prohibition would flow

from Congress's power to enforce the "Fourteenth Amendment's Equal Protection Clause"—"*not . . .* Fifteenth, Nineteenth, or Twenty-Fourth Amendments." *Id.*

## C. Precedent supports this Court's holding that the "right to vote" does not protect a preference for mail-in voting

Precedent supports *Tully*'s holding that the "right to vote" does not include a right to vote by mail as well. As this and "other courts have stated, 'as long as the state allows voting in person, there is no constitutional right to vote by mail.'" *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 607 (8th Cir. 2020) (quoting *Common Cause Ind. v. Lawson*, 977 F.3d 663, 664 (7th Cir. 2020)); *see Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 144 & n.7 (5th Cir. 2020); *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 232 (5th Cir. 2020); *Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020); *Griffin*, 385 F.3d at 1130. "That the State accommodates some voters by permitting (not requiring) the casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 209 (2008) (Scalia, J., concurring).

*TDP* does not hold otherwise. *Contra* Br. 21–22. In *TDP*, the Fifth Circuit rejected a Twenty-Sixth Amendment claim challenging a Texas law permitting voters "65 years of age or older" to vote by mail but requiring younger voters to be "absent from their county of residence," "sick," "disabled," or "confined to jail." 978 F.3d at 174. True, the court expressed some "uncertainties" about whether *McDonald* was controlling because of *American Party of Texas v. White*, 415 U.S. 767 (1974). *TDP*, 978 F.3d at 194. But it did not consider *Tully*'s explanation about how to reconcile those precedents. *See Tully*, 977 F.3d at 614. And in any event, the Fifth Circuit ruled

31

that *McDonald* "certainly assisted" "[u]nderstanding what the right to vote meant at the time the Twenty-Sixth Amendment was ratified." *TDP*, 978 F.3d at 185. Thus, relying on *McDonald*, state laws at the time, and the Amendment's drafting history, the Fifth Circuit in *TDP* reached the same conclusion as this Court in *Tully*: "the right to vote in 1971 did not include a right to vote by mail." *Id.* at 188.

*Smith v. Meese*, 821 F.2d 1484 (11th Cir. 1987), does not "h[o]ld" the right to vote includes a preference to vote by mail either. Br. 20. In *Meese*, the court did not address the merits of any constitutional question regarding voting rights. It reversed and remanded on standing grounds. 821 F.2d at 1486. It merely observed that the Constitution generally protects "registering to vote and voting with absentee ballots." *Id.* at 1490. And the court never reconciled that passing remark with *McDonald*'s express holding that a claim for unlimited mail-in voting is "not [really about] the right to vote" but a non-existent "right to receive absentee ballots." 394 U.S. at 807.

*Jolicoeur v. Mihaly*, 488 P.2d 1 (Cal. 1971), does not support plaintiffs' bid for universal mail-in voting. *Contra* Br. 22. In *Jolicoeur*, the court held unconstitutional California registration practices that prevented "young people" from registering to vote at their "permanent residences" and thereby "disqualified" them from voting. 488 P.2d at 698–99, 571. It did not consider or hold that the Twenty-Sixth Amendment requires States to accommodate a voter's preference to vote by mail. Rather, the court mentioned absentee voting only to make the point that requiring permanent residents of California to vote absentee in another State would violate the Twenty-Sixth Amendment by excluding them from "local political activity." *Id.* at 571.

32

*Colorado Project-Common Cause v. Anderson*, 495 P.2d 220 (Colo. 1972) (en banc) (cited Br. 22), did not address whether the Twenty-Sixth Amendment encompasses a preference for voting by mail either. In that case, the court held unconstitutional a Colorado law that entirely denied persons "between the ages of eighteen and twenty-one" the ability "to participate in the [state ballot] initiative process," including by "vot[ing] for initiated measures." 495 P.2d at 221, 223. And while the court also invalidated restrictions on circulating and signing petitions for initiatives, it did not ground that holding in the Amendment's text. It instead relied on a "conce[ssion]" by the "attorney general," vague notions about "public policy . . . favoring full participation of young voters," and Congress's putative "hope that youths' idealism could be channeled within the political system." *Id.* at 223.

Plaintiffs' remaining appellate cases (Br. 22–23 & n.8) scarcely bear mention. One of the cited Sixth Circuit decisions was vacated after the Supreme Court stayed the preliminary injunction at issue. *See Ohio State Conf. of NAACP v. Husted*, No. 14-3877, 2014 WL 10384647, at *1 (6th Cir. Oct. 1, 2014). The other Sixth Circuit decision addressed changes to Ohio's early-voting regime that "extensive evidence" showed would "in fact . . . preclude[]" "a significant number of [people] from voting." *Obama for Am. v. Husted*, 697 F.3d 423, 430–31 (6th Cir. 2012). It, like plaintiffs' other cases, did not involve a claim that the Constitution requires States to permit voting by mail where—as here—there is no hindrance to voting by other methods. *See id.; see also Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 109 n.9 (2d Cir.

2008) (observing that, unlike in *McDonald*, the record was not "barren" of such evidence); *Walgren v. Howes*, 482 F.2d 95, 99 n.9 (1st Cir. 1973) (citing allegations the law would "dilute" votes' value). And the Sixth Circuit has since unequivocally held that "there is no constitutional right to an absentee ballot." *Mays*, 951 F.3d at 792 (citing *McDonald*, 394 U.S. at 807–09).

### D.    Plaintiffs' remaining arguments lack merit

Plaintiffs offer two remaining arguments against *Tully*'s holding—neither meritorious. First, plaintiffs repeatedly assert that the "Twenty-Sixth Amendment prohibits both the denial *and* the abridgement of the right to vote based on age." Br. 9; *see* Br. 8–13, 20. But that truism does not answer what the "right to vote" means— the initial question on which plaintiffs' claim "hinge[s]." *Tully*, 977 F.3d at 611. Saying States cannot abridge a putative right to use a preferred voting method (*e.g.*, voting by mail) does not establish the right exists in the first place.

Second, invoking political pressures "for broader access to the ballot," plaintiffs urge this Court to "err on the side of inclusiveness." Br. 15. But the task in constitutional interpretation is to search for the text's original "public meaning," not intentionally distort it. *Gamble*, 139 S. Ct. at 1965; *see Rhode Island v. Massachusetts*, 37 U.S. 657, 721 (1838). Besides, invalidating state laws merely out of caution would be inconsistent with the "unquestioned," "historic" authority of States to regulate elections, except as expressly limited by the Constitution, *Carrington v. Rash*, 380 U.S. 89, 90–92 (1965), and the Tenth Amendment's reservation of authority over elections to the States, *see Shelby Cnty. v. Holder*, 570 U.S. 529, 534 (2013).

### III.   Making It Easier for the Elderly To Vote Does Not "Deny" or "Abridge" Any Rights Protected by the Twenty-Sixth Amendment

This Court need not say more than the "right to vote" in the Twenty-Sixth Amendment means the "ability to vote" to resolve this case. *Tully v. Okeson*, 977 F.3d 608, 613 (7th Cir. 2020). Plaintiffs are wrong to claim that Indiana "abridges" their right to vote on account of age regardless. Br. 23. As the Fifth Circuit held in rejecting a similar challenge to a Texas law that permits the elderly to vote by mail, to "abridge" means to make voting "more difficult." *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 192 (5th Cir. 2020) (*TDP*), *cert. denied* 141 S. Ct. 1124 (2021). A "law that makes it *easier* for others to vote does not abridge any person's right to vote for purposes of the Twenty-Sixth Amendment." *Id.* at 191. Indiana thus does not abridge plaintiffs' rights on account of age by making voting "'easier" for the "elderly," *Tully*, 977 F.3d at 614, 616—"senior citizens" who frequently experience "impediments not experienced by most other Hoosiers voters," *id.* at 619 (Ripple, J., concurring).

#### A.   Abridging the right to vote requires intentionally making it harder to vote on account of age

Although plaintiffs do not argue that Indiana "denies" them the right to vote—it is undisputed that plaintiffs could vote in person—they contend Indiana nonetheless "abridges" their right. Br. 13. To abridge means "to shorten" or "to diminish." *Webster's Third New International Dictionary* 6 (1986); *see The American Heritage Dictionary* 4 (1980) ("To curtail; to cut short"). That definition "necessarily entails a comparison. It makes no sense to suggest that a voting practice 'abridges' the right to vote without some baseline with which to compare the practice." *Reno v. Bossier Par.*

*Sch. Bd.*, 528 U.S. 320, 334 (2000). Determining whether the right to vote has been abridged therefore requires determining the baseline.

The Twenty-Sixth Amendment itself supplies that baseline. It protects the "right . . . to vote," *i.e.*, the ability to "exercise a political franchise." *Webster's Third New International Dictionary* 2365 (1986); *see The American Heritage Dictionary* 1437 (1980) ("To express one's preference by a vote; cast one's vote"; "To express one's preference for; endorse by vote"). Every exercise of the franchise of course "requires some effort and compliance with some rules." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2338 (2021); *see Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004) ("[a]ny . . . restriction is going to exclude, either de jure or de facto, some people from voting"). So the mere fact that a voter must contend with the ordinary, incidental burdens of voting does not mean the voter's right has been abridged. *See TDP*, 978 F.3d at 192. Rather, as reinforced by the pairing of "den[y]" and "abridge[]," abridgment connotes an obstacle that "makes [voting] more difficult" than usual. *Id.*; *see Tully*, 977 F.3d at 614 ("'[A]n election law abridges a person's right to vote for the purposes of the Twenty-Sixth Amendment only if it makes voting more difficult.'").

Precedent from related contexts supports that understanding of "abridge-[ment]." *TDP*, 978 F.3d at 192. The Fifteenth Amendment, like the Twenty-Sixth Amendment, prohibits the "den[ial]" or "abridge[ment]" of the "right . . . to vote." U.S. Const. amend. XV, § 1. Applying the Fifteenth Amendment, the Supreme Court has invalidated practices that "indirectly den[y]" the franchise, *Smith v. Allwright*, 321 U.S. 649, 664 (1944), "manipulate[] [it] out of existence," *Gomillion v. Lightfoot*, 364

U.S. 339, 345 (1960), or "effectively handicap exercise of the franchise" through imposition of "onerous" prerequisites, *Lane v. Wilson*, 307 U.S. 268, 275 (1939). But the Supreme Court has not decreed that States make voting easier than usual simply to accommodate voters. *See City of Mobile v. Bolden*, 446 U.S. 55, 61–65 (1980) (plurality op.); *Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 51–53 (1959). Simply put, its concern has been with discriminatory practices that "erect[] a real obstacle to voting." *Harman v. Forssenius*, 380 U.S. 528, 541 (1965).

Decisions under VRA § 2 point in the same direction. Section 2 prohibits any practice "which results in a denial or abridgment of the right . . . to vote." 52 U.S.C. § 10301(a). Enacted under Congress's enforcement powers, § 2 is more demanding than the Constitution itself. *See Brnovich*, 141 S. Ct. at 2332. It changes the "baseline" for evaluating state election laws, *Luft v. Evers*, 963 F.3d 665, 672 (7th Cir. 2020), requiring that all political processes leading to an election be "equally open" and provide equal "opportunity" to a protected class, 52 U.S.C. § 10301(b). Even so, "§ 2(a) does not condemn a voting practice just because it has a disparate effect on minorities," *Frank v. Walker*, 768 F.3d 744, 753 (7th Cir. 2014), or "makes voting harder for any identifiable group," *Luft*, 963 F.3d at 673. Section 2 demands a showing that the total burdens imposed by state law on protected groups "exceed 'the usual burdens of voting.'" *Brnovich*, 141 S. Ct. at 2344 (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008) (opinion of Stevens, J.)).

The considerations relevant for evaluating a § 2 claim illustrate how demanding the standard is. First, under § 2, a "highly relevant" consideration is the "size of

the burden imposed by the challenged voting rule." *Brnovich*, 141 S. Ct. at 2338. Section 2's terms "connote the absence of obstacles and burdens that *block* or *seriously hinder voting*"; it, however, "tolerate[s] the 'usual burdens of voting.'" *Id.* (emphasis added) (quoting *Crawford*, 553 U.S. at 198 (opinion of Stevens, J.)). Also relevant is "the degree to which a voting rule departs from what was standard practice when § 2 was amended in 1982." *Id.* Section 2 was not enacted to "uproot facially neutral time, place, and manner regulations that have a long pedigree or are in widespread use," such as requirements that "nearly all voters . . . cast their ballots in person on election day." *Id.* at 2339. And still other relevant considerations are the "size of any disparities in a rule's impact," the other "opportunities provided" for voting, and the "strength of state interests served by a challenged voting rule." *Id.*

Although the Constitution itself does not require § 2's multi-factor analysis, the considerations relevant for a § 2 analysis support the conclusion that the usual burdens of voting are relevant to the concept of abridgment. If making voting easier for some groups does not abridge the right to vote under § 2's more stringent standard that requires equal openness and opportunity, it does not abridge anyone's constitutional rights under a less stringent one. The Twenty-Sixth Amendment thus cannot be construed as a "positive" command to treat all voters identically. *TDP*, 798 F.3d at 189. The prohibition against "abridge[ment]" is simply a prohibition against "making voting *more* difficult" than usual. *Id.* at 191; *see id.* at 189, 192; *Tully*, 977 F.3d at 619 (Ripple, J., concurring) (observing that granting a "special accommodation" to those who need it does not "constitute[] an abridgement" of others' right to vote).

**B.   Making it easier for the elderly to vote by mail does not abridge anyone's right to vote on account of age**

1.    Indiana's absentee-voting regime does not abridge the right to vote on account of age in violation of the Twenty-Sixth Amendment. Plaintiffs offer no argument that Indiana "abridged" their right to vote on account of age before it permitted mail-in voting or expanded mail-in voting in 1993 to elderly voters. *See* 1993 Ind. Legis. Serv. P.L. 3-1993, § 124. Such an argument would be implausible. It is "obvious" that the Constitution does not decree "all-mail voting." *Griffin*, 385 F.3d at 1130; *see Tully*, 977 F.3d at 318. Indeed, when the Amendment was adopted in 1971, and for years after, "[i]n-person voting was the rule, absentee voting the exception." *TDP*, 978 F.3d at 188. "[O]nly narrow and tightly defined categories of voters" were permitted "to cast absentee ballots." *Brnovich*, 141 S. Ct. at 2339. And even then absentee voting was often closer to in-person early voting. *See* pp. 24–25, *supra*.

Measured against 1971 norms, the voting opportunities Indiana provides to all voters are positively generous. Any voter—including plaintiffs—can vote in person on election day or 28 days before the general election (a rarity in 1971). Ind. Code §§ 3-11-4-1, 3-11-10-26. And Indiana recognizes more valid excuses for voting by mail than were recognized in 1971, either by Indiana or other States. In 1971, for example, eligible voters working on election day and parents caring for sick children could not vote absentee in many States. *See* Note, *The Submerged Constitutional Right to an Absentee Ballot*, 72 Mich. L. Rev. 157, 161 (1973). Now under Indiana law, anyone meeting one of thirteen different criteria—including people working on election day and caring for the sick—can vote by mail. *See* Ind. Code § 3-11-10-24(a).

When Indiana extended mail-in voting to the elderly in 1993, moreover, non-elderly voters—including plaintiffs—did not lose any opportunities to vote. Plaintiffs may not have been relieved of the usual burdens of voting, such as traveling to the polls. *See Brnovich*, 141 S. Ct. at 2338. But those burdens are solely attributable to a preexisting, unchallenged requirement that voting be done in person. And voting is not a zero-sum game in which every change to election laws making it easier for one group to vote makes it harder for someone else. As this Court previously held, Indiana's decision to make "casting a ballot easier" for the elderly did not make it "harder for *anyone* to cast a ballot." *Tully*, 977 F.3d at 916 (emphasis added); *see id.* at 614. No one's rights were "abridged" on account of age.

If anything, making voting easier for the elderly promoted compliance with the Twenty-Sixth Amendment. As officials know from "general experience in dealing with the problems of the aged," the "physical and social conditions that invariably afflict senior citizens" can "deter[]" them from "coming to the polls on a November day." *Tully*, 977 F.3d at 619 (Ripple, J., concurring). By allowing the elderly to vote by mail, Indiana "simply employed a reasonable methodology to identify those who . . . needed a special accommodation to get to the polls. This is hardly an invidious classification based on age." *Id.*; *cf. Crawford*, 553 U.S. at 212 n.4 (Souter, J., dissenting) (deeming it "commendable" for Indiana "to make absentee voting available to the elderly"). Rather, this "solicitude" ensures that "everyone who experiences the barriers associated with old age can vote." *Tully*, 977 F.3d at 619 (Ripple, J., concurring).

40

2.     Historical practice confirms that not all age-related distinctions abridge the right to vote under the Twenty-Sixth Amendment. Since the Amendment's ratification, there has been a steady increase in accommodations granted to the elderly. Three years before the Amendment's ratification, "only two states . . . provid[ed] a special privilege for older voters to cast absentee ballots; by 1973, there were four." *TDP*, 978 F.3d at 186–87. In 1975, Texas "extended absentee voting to voters 65 years of age or older," *In re Texas*, 602 S.W.3d 549, 558 (Tex. 2020), "to bring the Texas Election Code into conformity with" with "amendments to the . . . U.S. Constitution," House Comm. on Elections, Bill Analysis, S.B. 1047, 64th Leg., R.S. (1975), https://lrl.texas.gov/LASDOCS/64R/SB1047/SB1047_64R.pdf#page=82. And at least 14 States eventually authorized alternative voting arrangements for the elderly.[1]

Still more States accommodate the elderly in other ways. Some States allow voters "over the age of 70" to "move to the front of the line" at polling places, Ala. Code

---

[1] *See* Ariz. Stat. § 16-581(B)(1) (permitting "alternative voting" for "elderly" persons "sixty-five years of age or older"); Ga. Code § 21-2-381 (permitting absentee ballots for "[a]ny elector meeting criteria of advance age"); Ind. Code § 3-11-10-24(a) (permitting the "elderly" to vote by mail); Ky. Rev. Stat. § 117.085 (permitting absentee ballots for voters unable to vote in person "on account of age"); La. Rev. Stat. § 1303(J) ("A person who has attained the age of sixty-five years or more may vote absentee by mail"); Mich. Comp. L. § 168.758 (1996) (permitting absentee ballots for a voter "over 60 years of age"); Miss. Code § 23-15-715 (authorizing absentee ballots for "persons who are sixty-five (65) years of age or older"); Mo. Stat. § 115.277(6)(1) (2020) (permitting voters "sixty-five years of age or older" to vote absentee); N.C. Gen. Stat. § 163-166.9 (permitting curbside voting for anyone otherwise unable to vote "because of age"); S.C. Code § 7-15-320 (qualifying "persons sixty-five years of age or older" for absentee voting); Tenn. Code § 2-6-201(5)(A) (authorizing "[a] person sixty (60) years of age or older" to vote absentee upon that person's request); Tex. Elec. Code § 82.003 (authorizing "voting by mail . . . if the voter is 65 years of age or older on election day"); Va. Code § 24.2-416.1 (2004) (authorizing voter registration by mail for any otherwise qualified "voter 65 or older"); W. Va. Code § 3-3-1(b)(1)(B) (permitting voting by mail due to "[p]hysical disability or immobility due to extreme advanced age").

§ 17-9-13(c)–(e), authorize special assistance for "elector[s] who [are] 75 years of age or older," Ga. Code § 21-2-409.1, or provide "priority" voting booths for "electors over sixty-five (65) years of age," R.I. Stat. § 17-19-51. Other States exempt "[p]ersons 65 years of age or older" from having to show "identification" to vote. Fla. Stat. § 97.0535(4)(a); *see* Ala. Code § 17-9-30(d) (waiving requirement for voters covered by "the Voting Accessibility for the Elderly and Handicapped Act"); Mich. Comp. L. § 28.292 (waiving identification card fees for "an individual 65 years of age or older").

Congress, meanwhile, requires States to assist older voters "to promote the fundamental right to vote by improving access for handicapped and elderly individuals." 52 U.S.C. § 20101; *see id.* § 20107(2) (defining "elderly" to mean "65 years of age or older"). Federal law requires States to "assure that all polling places for Federal elections are accessible to handicapped and elderly voters," and if a voter is not assigned to an accessible polling place States must provide the voter "with an alternative means for casting a ballot on the day of the election." *Id.* § 20102(b)(2)(B)(ii). That both States and Congress have long made special accommodations for the aged is strong evidence that the Twenty-Sixth Amendment does not prohibit them. *See Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259–60 (2022).

3.    Precedent further reinforces that Indiana does not abridge anyone's right to vote by making voting easier for the elderly. In *TDP*, the Fifth Circuit held that a Texas law conferring "a privilege to those at least age 65 to vote absentee did not deny or abridge younger voters' rights who were not extended the same privilege." 798 F.3d at 192. Relying "on the meaning of the word 'abridged,'" it explained that

the right to vote is not abridged "unless the challenged law creates a barrier to voting that makes it more difficult for the challenger to exercise her right to vote relative to the *status quo*, or unless the *status quo* itself is unconstitutional." *Id.* And it observed that requiring in-person voting is not "unconstitutional," especially considering that Texas permits voting by mail where needed. *Id.* at 192–93. The same is true here.[2]

### C.  Plaintiffs' criticisms miss the mark

1.     Plaintiffs offer no reason to reach a different result than *TDP*. Agreeing that the concept of abridgement requires a comparison, plaintiffs criticize the Fifth Circuit's decision on the ground that it "improperly import[ed]" a "retrogression standard from Section 5 of the VRA." Br. 25. That misreads the court's decision. In explaining that a law abridges the right to vote when it "makes voting *more difficult* for that person before the law was enacted or enforced," the Fifth Circuit acknowledged a "possible exception." *TDP*, 978 F.3d at 189–91. It recognized that a different comparison would need to be made if the "*status quo* itself is unconstitutional." *Id.* at 192; *see id.* at 189 (similar). But the court determined there was no need to apply that exception because it saw "no basis to hold that Texas's absentee-voting rules as a whole are something that ought not to be." *Id.* at 189.

That observation applies with equal force here. Although plaintiffs argue that Indiana abridged their right to vote by extending an accommodation to elderly voters, they have not argued that the Twenty-Sixth Amendment would require unlimited

---

[2] To the extent *TDP* suggests in dicta that States can never retract an indulgence once granted or make voting harder, *see* 978 F.3d at 191, that is inconsistent with abridgement's meaning outside the context of VRA § 5, *see Luft*, 963 F.3d at 673.

mail-in voting without that accommodation. It is "obvious" that the Constitution does not require "all-mail voting" or anything comparable. *Griffin*, 385 F.3d at 1130; *see Tully*, 977 F.3d at 618 ("we should not, and will not, judicially legislate so radical a reform as unlimited absentee voting in the name of the Constitution" (brackets and quotation marks omitted)). The Amendment is nothing more than a "negative" prohibition on denying or abridging the right to vote as it existed. *City of Mobile*, 446 U.S. at 61–65 (plurality op.). It is not a positive entitlement to no-excuse voting by mail.

2.      Neither *Lane* nor *Forssenius* undermines *TDP*. *Contra* Br. 26. As *TDP* observed, *Lane* involved a situation in which Oklahoma made it harder for black voters to vote at all. 978 F.3d at 189–90. "When Oklahoma was admitted as a state in 1907, it imposed a literacy test that, because of how it was administered, effectively denied most black Oklahomans the right to vote." *Id.* "The test was invalidated by the Supreme Court." *Id.* Oklahoma then devised a registration system whose "practical effect" was to reimpose nearly the same discriminatory system held unconstitutional. *Lane*, 307 U.S. at 276–27. In view of that evidence, the Supreme Court held the new system "invalid" because it was nothing more than a "substitute[] for the invalidated" literacy test. *Id.* at 277. *Lane* thus stands for nothing more than the proposition that "effectively handicap[ping]" the ability to vote is unconstitutional. *Id.* at 275. It does not show that every accommodation abridges the right to vote.

*Forssenius*'s lesson is similar. There, "the Supreme Court held that Virginia abridged the right to vote in violation of the Twenty-Fourth Amendment when voters were required to choose between paying a poll tax or filing a certificate of residence."

*TDP*, 978 F.3d at 190. Although plaintiffs say that Virginia did not make it harder to vote but "merely added another option for qualifying to vote," Br. 27, that portrayal overlooks that the supposed "option" was no alternative at all. The Supreme Court viewed the requirement to file a certificate as means of maintaining an unconstitutional poll tax, observing that filing a certificate annually was more "cumbersome procedure" than paying a "'simple' poll tax." *Forssenius*, 380 U.S. at 541–42. The situation could not be more different here. Indiana did not reimpose any unconstitutional prerequisite to voting by giving the elderly an option to vote by mail.

3.     Plaintiffs also invoke cases construing § 2 of the VRA, saying they support an "equal-treatment" requirement. Br. 24–25. But that argument overlooks textual differences between VRA § 2 and the Twenty-Sixth Amendment. Whereas VRA § 2 requires that the "political processes leading to nomination or election" be "equally open" to a protected class and provide equal "opportunity," 52 U.S.C. § 10301(b), the Twenty-Sixth Amendment requires that the "right . . . to vote" not be "denied" or "abridged," U.S. Const. amend. XXVI, § 1. As this Court previously explained, the Amendment's language does not import the Fourteenth Amendment's equal-protection requirement. *See Tully*, 977 F.3d at 614. Additionally, plaintiffs' argument overlooks the historical record showing Congress and ratifying States did not understand § 2 to forbid easing voting for the elderly. *See* pp. 41–42, *supra*.

Nor are plaintiffs correct in portraying VRA § 2 as forbidding all distinctions that impact groups differently. In *Brnovich*, the Supreme Court explained that § 2 "tolerate[s] the 'usual burdens of voting.'" 141 S. Ct. at 2338 (quoting *Crawford*, 553

U.S. at 198 (opinion of Stevens, J.)). Section 2's prime concern is with "obstacles and burdens that *block or seriously hinder* voting." *Id.* (emphasis added). And in determining what constitutes permissible burdens, the Supreme Court directed courts to consider other factors—including a challenged rule's "impact," the state interest it serves, and the fact that "no-excuse absentee voting" was nearly nonexistent when VRA § 2 was amended. *Id.* at 2338–39. That those considerations are relevant to a § 2 analysis forecloses plaintiffs' view that everything turns "almost entirely on just one circumstance"—whether a voting rule impacts groups differently. *Id.* at 2341.

4.    Finally, plaintiffs are wrong that the reason Indiana accommodates elderly voters is immaterial. Br. 27. Whether or not the Fifteenth Amendment prohibits "voting restrictions based on race . . . whatever their justification," Br. 27, "it is far from clear that the Twenty-Sixth Amendment should be read" to "import[]" that principle, *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 607 (4th Cir. 2016). Whereas race is "'seldom relevant to the achievement of any legitimate state interest,'" age often is. *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83–84 (2000). That is true in the voting context as well. As States and Congress have recognized, the elderly may require special assistance getting to the polls, special accommodations at the polls, or alternatives to voting in person "because of the physical and social conditions that invariably afflict senior citizens." *Tully*, 977 F.3d at 619 (Ripple, J., concurring). Attempting to put the elderly on the same plane as others is "hardly . . . invidious." *Id.*

Even as States have legitimate reasons for assisting the aged, States have legitimate reasons for not allowing "unfettered" mail-in voting. *Tully*, 977 F.3d at 617

(majority op.). Limiting mail-in voting to "those Hoosiers who are most likely to benefit from it" helps to "prevent[] voter fraud and 'other abuses' that are 'facilitated by absentee voting.'" *Id.* (quoting *Griffin*, 385 F.3d at 1130). It also helps to minimize the number of invalid ballots cast, preserve counties' administrative capacity for mail-in ballots, and ensure more voters are aware of late-breaking news when they go to cast their ballots. *See id.*; *Griffin*, 385 F.3d at 1130–32. The mere fact that plaintiffs do not find voting as "convenient" as they would like "does not an unconstitutional system make." *Luft*, 963 F.3d at 675; *see Tully*, 977 F.3d at 616.

### D.    Plaintiffs are not entitled to universal mail-in voting

The relief plaintiffs seek—"unlimited" voting by mail—underscores just how "radical" their Twenty-Sixth Amendment theory is. *Tully*, 977 F.3d at 618. Where unequal treatment of two groups is unconstitutional, that disparity can be cured "either by extending the benefits or burdens to the exempted class, or by nullifying the benefits or burdens for all." *Barr v. Am. Assoc. of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2354 (2020). "'How equality is accomplished . . . is a matter on which the Constitution is silent.'" *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1698 (2017) (quoting *Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 426–27 (2010)). It is an issue "'of state law.'" *Id.* at 1698 n.23 (quoting *Stanton v. Stanton*, 421 U.S. 7, 18 (1975)); *see Ill. Republican Party v. Pritzker*, 973 F.3d 760, 771 (7th Cir. 2020). And Indiana law provides for severance of an invalid statutory provision unless the provision "is so essentially and inseparably connected with" the rest of the statute that the statute

would not have been enacted otherwise or "cannot be executed in accordance with legislative intent." Ind. Code § 1-1-1-8(a)–(b).

Applying Indiana severability rules here would require striking out the accommodation granted to "elderly voter[s]" in Indiana Code § 3-11-10-24(a)(5). As evidenced by the fact that Indiana's absentee-voting regime predated the addition of the "elderly voter[s]" provision in 1993, *see* 1993 Ind. Legis. Serv. P.L. 3-1993, § 124, the regime as a whole can stand without the "elderly voter[s]" provision. But the regime could not function consistent with legislative intent if a court rewrote "elderly voter[s]" to mean "all voters." Such a revision would render a "nullity" the other twelve bases for voting absentee listed in Indiana Code § 3-11-10-24(a). *N. Ind. Bank & Tr. Co. v. State Bd. of Fin. of Ind.*, 457 N.E.2d 527, 532 (Ind. 1983). And it would run counter to the principle that, after an unconstitutional change, the "original, pre-amendment statute" is the "'valid expression of the legislative intent.'" *Barr*, 140 S. Ct. at 2353 (quoting *Frost v. Corp. Comm'n of Okla.*, 278 U.S. 515, 526–27 (1929)).

What is more, decreeing universal mail-in voting would fundamentally alter Indiana's system of voting. Currently, in-person voting is the norm. *All* registered voters are permitted to vote in person on election day, or in-person 28 days before the general election. *See* Ind. Code §§ 3-11-4-1, 3-11-8-2, 3-11-10-26. Voting by mail is the exception. Only voters with a valid excuse may vote by mail. *Id.* § 3-11-10-24(a)–(b). Decreeing that everyone can vote by mail would fundamentally alter the balance the Indiana General Assembly struck by placing mail-in voting on par with in-person voting. So "radical a reform as unlimited absentee voting" must come through the

48

political process rather than "judicial[] legisl[ation]." *Tully*, 977 F.3d at 618 (brackets

and quotation marks omitted); *see Griffin*, 385 F.3d at 1130.

**CONCLUSION**

The district court's judgment should be affirmed.

Respectfully submitted,

THEODORE E. ROKITA
Attorney General of Indiana

/s/ Thomas M. Fisher
THOMAS M. FISHER
Solicitor General

JAMES A. BARTA
Deputy Solicitor General

MELINDA R. HOLMES
RAZI S. LANE
Deputy Attorneys General

Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-6255
Tom.Fisher@atg.in.gov

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limitation of Circuit Rule 32(c) because this document contains 13,919 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.     This document complies with the typeface requirements of Circuit Rule 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 12-point font.

Dated: January 27, 2023                    /s/ Thomas M. Fisher

THOMAS M. FISHER
Solicitor General

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Thomas M. Fisher
THOMAS M. FISHER
Solicitor General