No. 22-2835

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

BARBARA TULLY, KATHARINE BLACK, MARC BLACK, DAVID CARTER, REBECCA GAINES, DAVID SLIVKA, DOMINIC TUMMINELLO, and INDIANA VOTE BY MAIL, INC., individually, and on behalf of those similarly situated,

*Plaintiffs-Appellants*,

and CHAQUITA MCCLEARY,

*Plaintiff*,

v.

PAUL OKESON, SUZANNAH WILSON OVERHOLT, KAREN CELESTINO-HORSEMAN, and LITANY PYLE, in their official capacity as members of the Indiana Election Commission, and HOLLI SULLIVAN, in her official capacity as the Indiana Secretary of State,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Indiana
No. 1:20-cv-01271-JPH-DLP

### REPLY BRIEF OF PLAINTIFFS-APPELLANTS

William R. Groth, Of Counsel
VLINK LAW FIRM LLC
3719 S. East St., Suite A
Indianapolis, IN 46227
(317) 637-2345, Ext. 132
WGroth@fdgtlaborlaw.com

Mark W. Sniderman
SNIDERMAN LAW
151 N. Delaware Street, Ste. 1520
Indianapolis, IN 46204
(317) 361-4700
msniderman@snidermanlaw.com

Jed W. Glickstein
   *Counsel of Record*
Gary A. Isaac
Michael A. Scodro
Brett E. Legner
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600
gisaac@mayerbrown.com
jglickstein@mayerbrown.com
mscodro@mayerbrown.com
blegner@mayerbrown.com

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................... 1

I.    Defendants Continue To Misconstrue The "Right to Vote.".......................... 2

    A.    Case law does not support Defendants ..................................... 3

    B.    History does not support Defendants ...................................... 8

II.   Defendants Continue To Misconstrue "Abridgment." ................................. 13

    A.    Defendants ignore *Bossier Parish* ......................................... 13

    B.    History again does not support Defendants................................ 19

III.  The Law-Of-The-Case Doctrine Remains Inapplicable................................ 20

IV.   Remedial Arguments Are Premature.............................................. 22

CONCLUSION................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AAR Int'l, Inc. v. Nimelias Enters. S.A.*,
  250 F.3d 510 (7th Cir. 2001) ................................................. 23

*Agostini v. Felton*,
  521 U.S. 203 (1997) .......................................................... 22

*Allen v. State Bd. of Elections*,
  393 U.S. 544 (1969) .......................................................... 11

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) ........................................................... 3

*Baker v. Carr*,
  369 U.S. 186 (1962) .......................................................... 23

*Bartnicki v. Vopper*,
  532 U.S.514 (2001) .......................................................... 19

*Beer v. United States*,
  425 U.S. 130 (1976) .......................................................... 14

*Bostock v. Clayton Cnty.*,
  140 S. Ct. 1731 (2020) ................................................... 10, 19

*Brnovich v. Democratic Nat'l Committee*,
  141 S. Ct. 2321 (2021) ...................................................*passim*

*Brown v. Post*,
  279 F. Supp. 60 (W.D. La. 1968) ......................................... 2, 12

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ............................................................ 24

*Burdick v. Takushi*,
  504 U.S. 428 (1992) .......................................................... 3, 4

*Carrington v. Rash*,
  380 U.S. 89 (1965) ............................................................ 7

*City of Mobile v. Bolden*,
  446 U.S. 55 (1980) ........................................................... 17

*Clements v. Fashing,*
    457 U.S. 957 (1982) ............................................................... 4

*Common Cause Ind. v. Lawson,*
    978 F.3d 1036 (7th Cir. 2020) ............................................. 21

*Crawford v. Marion Cnty. Election Bd.,*
    553 U.S. 181 (2008) ............................................................. 18

*Daunt v. Benson,*
    999 F.3d 299 (6th Cir. 2021) ............................................... 21

*Davis v. Guam,*
    932 F.3d 822 (9th Cir. 2019) .......................................... 1, 18

*Frank v. Walker,*
    768 F.3d 744 (7th Cir. 2014) ......................................... 16, 17

*Gomillion v. Lightfoot,*
    364 U.S. 339 (1960) ...................................................... 2, 6, 7

*Goosby v. Osser,*
    409 U.S. 512 (1973) ............................................................... 5

*Griffin v. Roupas,*
    385 F.3d 1128 (7th Cir. 2004) ............................................... 6

*Guinn v. United States,*
    238 U.S. 347 (1915) ....................................................... 23, 24

*Harman v. Forssenius,*
    380 U.S. 528 (1965) ............................................................. 15

*Jolicoeur v. Mihaly,*
    488 P.2d 1 (Cal. 1971) .......................................................... 8

*Kramer v. Union Free Sch. Dist. No. 15,*
    395 U.S. 621 (1969) ............................................................... 5

*Lane v. Wilson,*
    307 U.S. 268 (1939) ......................................................... 8, 19

*Lassiter v. Northampton County Bd. of Elections,*
    360 U.S. 45 (1959) ................................................................ 7

*Luft v. Evers,*
    963 F.3d 665 (7th Cir. 2020) ............................................... 14

*Maryland Comm. for Fair Representation v. Tawes,*
    377 U.S. 656 (1965) ........................................................................ 24

*McDonald v. Board of Education Comm'rs of Chi.,*
    394 U.S. 802 (1969) ................................................................*passim*

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022) .................................................................... 19

*Oregon v. Mitchell,*
    400 U.S. 112 (1970) ........................................................................ 10

*Pitt News v. Pappert,*
    379 F.3d 96 (3d Cir. 2004) ............................................................. 20

*Reno v. Bossier Parish School Bd.,*
    528 U.S. 320 (2000) ................................................................*passim*

*Rice v. Cayetano,*
    528 U.S. 495 (2000) ............................................................... 1, 2, 10

*Santa Fe Pacific Corp. v. Central States, Se. & Sw. Plan,*
    22 F.3d 725 (7th Cir. 1994) ........................................................... 22

*Smith v. Allwright,*
    321 U.S. 649 (1944) ...................................................................... 2, 7

*South Carolina v. Katzenbach,*
    383 U.S. 301 (1966) ................................................................. 2, 7, 16

*Texas Democratic Party v. Abbott,*
    961 F.3d 389 (5th Cir. 2020) ......................................................... 17

*Texas Democratic Party v. Abbott,*
    978 F.3d 168 (5th Cir. 2020) ..................................................... 5, 13

*United States v. Mosley,*
    238 U.S. 383 (1915) ........................................................................ 16

*United States v. Reese,*
    92 U.S. 214 (1876) ............................................................................ 6

*Walgren v. Howes,*
    482 F.2d 95 (1st Cir. 1973) .............................................................. 5

*Williams v. Rhodes,*
    393 U.S. 23 (1968) ............................................................................ 7

## Statutes

52 U.S.C. § 10301 ................................................................ 13

52 U.S.C. § 10502 ................................................................ 9

52 U.S.C. § 20101 ................................................................ 20

Ind. Code § 3-11-10-24 ......................................................... 18

## Other Authorities

H.R. Rep. No. 92-37 (1971) ............................................... 11, 12

S. Rep. 92-26 (1971) ............................................................ 12

Br. of State Respondents, *Crawford v. Marion Cnty. Election Board*,
    No. 07-21 (U.S.), 2007 WL 4232930 ................................ 18

1 *An Analysis of Laws & Procedures Governing Absentee Registration
    & Absentee Voting in the United States*, Ind. Univ. Sch. of Pub. &
    Env. Affairs (1975) ......................................................... 9

Note, *The Submerged Constitutional Right to an Absentee Ballot*,
    72 Mich. L. Rev. 157 (1973) ............................................ 9

Pamela S. Karlan, *Equal Protection, Due Process, and the Stereoscopic
    Fourteenth Amendment*, 33 McGeorge L. Rev. 473 (2002) .................. 24

Vikram David Amar, *Taking (Equal Voting) Rights Seriously: The
    Fifteenth Amendment As Constitutional Foundation, & the Need for
    Judges to Remodel Their Approach to Age Discrimination in
    Political Rights*, 97 Notre Dame L. Rev. 1619 (2022) ........................... 13

## INTRODUCTION

Plaintiffs' position in this appeal is straightforward: the Twenty-Sixth Amendment—like the other Voting Amendments on which it is patterned—means what it says. The right to vote shall not be denied or abridged on account of race, sex, or, in federal elections, ability to pay a poll tax. Nor, for individuals eighteen years or older, shall the right be denied or abridged on account of age. The Amendments are cast in "fundamental terms," *Rice v. Cayetano,* 528 U.S. 495, 512 (2000), and "do[] not qualify the meaning of 'vote' in any way." *Davis v. Guam*, 932 F.3d 822, 830 (9th Cir. 2019). In light of this text and the Voting Amendments' "unique importance," "where there is any doubt," courts should "err on the side of inclusiveness.*" Id*.

A corollary to this principle is that, when interpreting and applying the Twenty-Sixth Amendment, the starting point is the other Voting Amendments—not Section 1 of the Fourteenth Amendment. The Voting Amendments specifically protect the "right to vote," and Defendants cite no evidence that the general Equal Protection Clause informed, much less exhausted, this guarantee. To the contrary, the Voting Amendments have "independent meaning and force." *Rice,* 528 U.S. at 522.

It follows from these principles that states may not allow only some voters to cast absentee mail-in ballots on the basis of age, even if doing so would not pose an equal protection problem. The Twenty-Sixth Amendment is violated whenever a state "abridges" younger voters' rights compared to older voters by enacting voting-related laws or practices that are facially discriminatory. *Reno v. Bossier Parish School Bd.*, 528 U.S. 320, 333-34 (2000). Defendants ask the Court to reject this logical syllogism, but their arguments are unavailing.

In nearly 50 pages of briefing, Defendants ignore both *Rice v. Cayetano* and *Bossier Parish*'s broad construction of "abridgment." Defendants also claim, incorrectly, that this Court's accelerated decision at the preliminary injunction stage forecloses Plaintiffs' arguments, when the Court stopped short of a merits determination and would not be bound by such a decision in any event. Finally, Defendants raise irrelevant remedial issues, which are neither presented by this appeal nor grounds for rejecting Plaintiffs' claim.

In short, as Defendants' brief confirms, Indiana's absentee voting laws violate the Twenty-Sixth Amendment and Plaintiffs are entitled to summary judgment. The Court should reverse the judgment below.

## I.    Defendants Continue To Misconstrue The "Right to Vote."

Plaintiffs demonstrated in their opening brief that the "right to vote" covers more than just the right to cast a ballot at a polling place on election day. Pls. Br. 13-18. Constitutional language that prohibits the denial or abridgment of the right to vote has "repeatedly been construed . . . to invalidate state voting qualifications *or procedures* which are discriminatory on their face or in practice"—like Indiana's voting procedures here. *South Carolina v. Katzenbach*, 383 U.S. 301, 325 (1966) (emphasis added). And courts have applied the Voting Amendments, or the parallel Voting Rights Act, to many scenarios other than casting a ballot in person. *E.g.*, *Gomillion v. Lightfoot*, 364 U.S. 339 (1960) (political subdivision boundaries); *Smith v. Allwright*, 321 U.S. 649 (1944) (party primaries); *Brown v. Post*, 279 F. Supp. 60 (W.D. La. 1968) (absentee ballots).

### A.    Case law does not support Defendants.

Defendants' brief focuses on Fourteenth Amendment decisions, which they claim have construed the "right to vote" as excluding absentee voting for all constitutional purposes. Because the starting point for analysis is the Voting Amendments, however, these cases have little relevance. That said, even if the Court were to begin with the Fourteenth Amendment cases, they do not justify a holding that absentee-voting laws may never violate the Voting Amendments. As shown below, the cases either support Plaintiffs or do not apply in this context.

1.    Quoting *Burdick v. Takushi*, 504 U.S. 428, 433 (1992), Defendants assert that the right to vote does not "include[] a 'right to vote in any manner.'" Defs. Br. 20. But Burdick recognized that "[e]ach provision" of a state's election law "inevitably affects" an individual's "right to vote." 504 U.S. at 433 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)). This includes laws that shape "the voting process itself." *Id*.

To be sure, *Burdick* held that the right to vote was not "absolute." 504 U.S. at 433. Because "government must play an active role in structuring elections," the Court explained, it is important not to "tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Id*. When considering constitutional claims arising under the First or Fourteenth Amendments, therefore, the Court called for "flexible" rather than strict scrutiny. *Id*. at 434. But this so-called "*Anderson-Burdick* test" has never applied to claims under the Voting Amendments. Among other things, the Voting Amendments do not allow for tiers of scrutiny. Instead, they

"prohibit[] all provisions denying or abridging the voting franchise of any citizen or class of citizens." Pls. Br. 27 (quoting *Rice*, 528 U.S. at 512).

    **2.**    Reliance on *McDonald v. Board of Education Commissioners of Chicago*, 394 U.S. 802 (1969), is misplaced for much the same reasons. Plaintiffs have addressed *McDonald*'s lack of relevance at length. Pls. Br. 18-23.

    ***First***, *McDonald* was not a Voting Amendments case, and Defendants effectively concede that it is therefore distinguishable for "*stare decisis* purposes." Defs. Br. 21. Indeed, *Burdick* cited *McDonald* in the course of explaining its "flexible" First and Fourteenth Amendment standard. 504 U.S. at 434. Further, the Supreme Court has described *McDonald* as simply "appl[ying] traditional equal protection principles to uphold a classification scheme that denied absentee ballots to inmates in jail awaiting trial." *Clements v. Fashing*, 457 U.S. 957, 966 (1982). Defendants themselves contend that the Twenty-Sixth Amendment "does not import the Fourteenth Amendment's equal-protection requirement." Defs. Br. 45.

    The most Defendants can say is that the Fifth Circuit believed that "[u]nderstanding what the right to vote meant at the time the Twenty-Sixth Amendment was ratified in 1971" was "assist[ed]" by "the 1969 *McDonald* decision." Defs. Br. 21-22 (quoting *Texas Democratic Party v. Abbott*, 978 F.3d 168, 185 (5th Cir. 2020)). But even if that characterization of *McDonald* were persuasive—and in light of text, structure, and doctrine, it is not—the Fifth Circuit expressly *abrogated* an earlier motions panel's holding that *McDonald* controlled in the Twenty-Sixth

Amendment context. *See* 978 F.3d at 193-94; *see also* Pls. Br. 22. Any "assistance" *McDonald* provides in this case thus cannot get Defendants over the goal line.

**Second**, *McDonald* acknowledged that its result would have been different if Illinois's absentee-ballot laws had been drawn using a suspect classification. As Defendants do not dispute, the Twenty-Sixth Amendment has made age a "suspect class" for voting purposes. *Walgren v. Howes*, 482 F.2d 95, 102 (1st Cir. 1973). Defendants assert that *McDonald*'s distinction between the "right to vote" and the "right to vote absentee" provided an "independent" basis for rejecting the inmates' claims. Defs. Br. 22. But again, the Fifth Circuit decision that Defendants rely on reached the opposite conclusion. *See Texas Democratic Party*, 978 F.3d at 193.

**Third**, *McDonald* framed its analysis in terms of whether the challenged voting laws *denied* the right to vote. In holding that the Fourteenth Amendment did not demand absentee ballots as long as Illinois prisoners could vote in other ways, the *McDonald* Court had no reason to, and did not, opine on the question posed by the Voting Amendments: whether the lack of ballots affected the right to vote short of a total denial. A number of the decisions Defendants cite (at Defs. Br. 20) reinforce this point. *See, e.g.*, *Goosby v. Osser*, 409 U.S. 512, 521-22 (1973) (*McDonald* asked whether the statutory scheme "absolutely prohibit[ed]" the plaintiffs "from voting"); *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626 n.6 (1969) ("absolute denial of the franchise"). Defendants brush off this distinction as a "truism" that "does not answer what the 'right to vote' means." Defs. Br. 34. But their own brief emphasizes

that "general language" about voting "should not be read apart from [its] immediate 'context.'" *Id.* at 23 (quoting *Illinois v. Lidster*, 540 U.S. 419, 424 (2000)).

In sum, as the Supreme Court has instructed, "[p]articularly in dealing with claims under broad provisions of the Constitution, which derive content by an interpretive process of inclusion and exclusion, it is imperative that generalizations, based on and qualified by the concrete situations that gave rise to them, must not be applied out of context in disregard of variant controlling facts." *Gomillion*, 364 U.S. at 343-44. For all these reasons, *McDonald* does not carry the day.

**3.**      Citing *Griffin v. Roupas*, 385 F.3d 1128 (7th Cir. 2004), and other Fourteenth Amendment decisions, Defendants argue that there is no "constitutional right to vote by mail." Defs. Br. 31. That misunderstands the nature of Plaintiffs' claim. The Twenty-Sixth Amendment does not secure an unqualified right to vote by mail. Rather, it secures a right to be free from discrimination in voting on account of age. Therefore, that states have "broad authority to regulate the conduct of elections" as a general matter, *Griffin*, 385 F.3d at 1130, does not license the exercise of that authority in ways that violate specific requirements in the Constitution. The Supreme Court has repeatedly made this point.

At one time, for example, it was "as much within the power of a State to exclude citizens of the United States from voting on account of race, &c., as it was on account of age, property, or education." *United States v. Reese*, 92 U.S. 214, 217-18 (1876). The Fifteenth Amendment, however, "invested the citizens of the United States with a new constitutional right"—namely, "exemption from discrimination in the exercise of

the elective franchise on account of race, color, or previous condition of servitude." *Id*. The Twenty-Sixth Amendment's passage did likewise for age. Many other cases hold, in a variety of contexts, that state authority to regulate elections is always subject to the express limitations of the Voting Amendments. *E.g.*, *Williams v. Rhodes*, 393 U.S. 23, 29 (1968) (ballot access laws); *Gomillion*, 364 U.S. at 345 (subdivision boundaries); *Lassiter v. Northampton County Bd. of Elections*, 360 U.S. 45, 52-53 (1959) (literacy tests); *Smith*, 321 U.S. at 661-62 (party primaries).

*Carrington v. Rash*, which Defendants cite as recognizing "unquestioned" state authority to regulate elections, is to similar effect. *See* Defs. Br. 34. In that case, the Supreme Court held that "the privilege to vote in a State is within the jurisdiction of the State itself, to be exercised as the State may direct, and upon such terms as to it may seem proper." 380 U.S. 89, 91 (1965). But the Court immediately qualified this rule, explaining that "of course" this authority would not permit a state to "discriminat[e] . . . between individuals, in violation of the Federal Constitution." *Id*. (quoting *Pope v. Williams*, 193 U.S. 621, 632 (1904)). The Supreme Court has "repeatedly" used the Voting Amendments to "invalidate state voting qualifications or procedures which are discriminatory on their face or in practice," and these decisions have been "rendered with full respect for the general rule" that states "have broad powers to determine the conditions under which the right of suffrage may be exercised." *Katzenbach*, 383 U.S. at 325 (citing *Carrington*, 380 U.S. at 91).[1]

---

[1] Defendants argue that the other cases cited in Plaintiffs' brief are not on point because they did not squarely hold that the Twenty-Sixth Amendment "requires States to accommodate a voter's preference by mail." Defs. Br. 32-34. That is of no moment. The cases interpreted and applied the Amendment in ways that cannot be reconciled with Defendants' reading of

**B.      History does not support Defendants.**

Defendants offer a handful of historical sources in an effort to show that the Twenty-Sixth Amendment contains no "preference" for mail-in voting. These sources do not support Defendants either.

1.      Defendants first argue that the Twenty-Sixth Amendment would not have created a "claimed right to unlimited, no-excuse, mail-in voting" because absentee voting, including by mail, was uncommon when the Amendment was adopted. Br. 25. Again, however, Plaintiffs do not contend that the Voting Amendments creates a "blanket right." Rather, Plaintiffs contend that the Voting Amendments "secure[] freedom from discrimination" in all "matters affecting the franchise." *Lane v. Wilson*, 307 U.S. 268, 274 (1939). This simply means a state cannot extend mail-in voting to certain voters on account of their race, sex, or age, but not others. *See supra* pp. 6-7.

Defendants also draw the wrong conclusions from the historical data. It is undoubtedly true that most voting in 1971 occurred in-person on election day (as is still the case for most states today). But it is also true that states employed a wide variety of absentee-voting procedures, which were viewed as part of each state's voting apparatus. As Defendants concede, the framers of the Twenty-Sixth Amendment were certainly "aware" of the breadth of state voting procedures in 1971.

---

*McDonald. See* Pls. Br. 22. For instance, if it was plain that the "right to vote" did not protect a "preference" to vote in a certain manner, the California Supreme Court would not have "h[e]ld" that the Twenty-Sixth Amendment required state officials to "treat all citizens 18 years of age or older alike for all purposes relating to voting," whether or not younger voters could vote absentee. *Jolicoeur v. Mihaly*, 488 P.2d 1, 12 (Cal. 1971).

Defs. Br. 25. Congress itself passed important absentee-voter legislation in 1970, one year before the Twenty-Sixth Amendment. *See* Pls. Br. 16.[2]

One of Defendants' historical sources notes that, near the Amendment's adoption, only four states gave voters sixty-five years or older the right to cast absentee ballots based on age. Note, *The Submerged Constitutional Right to an Absentee Ballot*, 72 Mich. L. Rev. 157, 160-61 n. 18 (1973). However, the "passage of the twenty-sixth amendment" was expected to increase demand for absentee balloting. *Id*. at 157-58 n.1. Another source cited by Defendants observed that "passage of the Twenty-Sixth Amendment . . . had the immediate effect of enfranchising large numbers of young military members and college students with great ramification on the absentee system." 1 *An Analysis of Laws & Procedures Governing Absentee Registration & Absentee Voting in the United States*, Ind. Univ. Sch. of Pub. & Env. Affairs 23 (1975). Thus, although it is not surprising that Congress did not discuss absentee voting specifically in the debates, it was foreseeable that the Twenty-Sixth Amendment had implications for absentee voting.

**2.** Defendants next ask the Court to consider the "origins" of the Twenty-Sixth Amendment. *See* Defs. Br. 25-27. Although Defendants are correct that the

---

[2] Defendants counter that this enactment "did not require States to allow mail-in absentee voting in all elections for any reason." Defs. Br. 29. But that is a red herring; Plaintiffs have never suggested anything of the sort. Defendants also argue that the Voting Rights Act targeted voters who would be absent on election day, supposedly "consistent" with the notion that "the right to vote means the ability to vote." *Id*. That is contrary to the words Congress used. Congress stated that "the lack of sufficient opportunities for absentee registration and absentee balloting in presidential elections . . . denies *or abridges* the inherent constitutional right of citizens to vote for their President and Vice President." 52 U.S.C. § 10502(a)(1) (emphasis added). This shows concern not just with the ability to vote, but also with the ways the right could be exercised.

Twenty-Sixth Amendment was motivated by the Supreme Court's partial invalidation of national voting-age legislation, *see Oregon v. Mitchell*, 400 U.S. 112 (1970), Plaintiffs have explained that the Twenty-Sixth Amendment "reaches 'beyond the principal evil' legislators may have intended or expected to address." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1749 (2020). Its text is broader than the statute invalidated in *Mitchell* and "transcend[s] the particular controversy which was the immediate impetus for . . . enactment." *Rice*, 528 U.S. at 512; *see also* Pls. Br. 8-11.

The Twenty-Sixth Amendment's "origins" are instructive for a second reason: *Mitchell* undercuts Defendants' position that the Fourteenth Amendment is the starting point for analysis. In that case, Justice Black—whose opinion Defendants state was "controlling" on this issue (Defs. Br. 29)—drew a clear distinction between what he called the "generalities of the Equal Protection Clause of the Fourteenth Amendment" and the more specific Voting Amendments. *Mitchell*, 400 U.S. at 135. As he explained, the Equal Protection Clause "was never intended" to "mak[e] the Nineteenth and Twenty-fourth Amendments superfluous." *Id*. at 126-27. In fact, despite a remarkably fragmented set of opinions, every Justice agreed that the Voting Amendments provided protections beyond the Fourteenth Amendment.[3]

---

[3] In addition to Justice Black's opinion in *Mitchell*:

- "I suppose that in 1920, when the Nineteenth Amendment was ratified giving women the right to vote, it was assumed by most constitutional experts that there was no relief by way of the Equal Protection Clause." *Mitchell*, 400 U.S. at 136 (Douglas, J.).

- "[T]he very fact that constitutional amendments were deemed necessary to bring about federal abolition of state restrictions on voting by reason of race (Amdt. XV), sex (Amdt. XIX), and . . . poll taxes (Amdt. XXIV), is itself forceful evidence of the common understanding . . . that the Fourteenth Amendment did not empower Congress to legislate in these respects." *Id*. at 201-02 (Harlan, J.).

In enacting the Twenty-Sixth Amendment, therefore, Congress would have had no reason to believe that an earlier and unmentioned Fourteenth Amendment case had effectively narrowed the Voting Amendments, let alone that it was necessary to expressly "overrule" (Defs. Br. 27) *McDonald* to give the Twenty-Sixth Amendment full force.

**3.** Defendants criticize Plaintiffs' historical evidence, but these criticisms are insubstantial. One of the Amendment's chief sponsors explicitly stated that the Amendment would use the same definition of "voting" used in the Voting Rights Act: "all action necessary to make a vote effective . . . including, but not limited to registration or other action required by law prerequisite to voting or casting a ballot." *See* Pls. Br. 15. This definition was also included in the House Judiciary Committee's report on the proposed amendment. *See* H.R. Rep. No. 92-37 at 8 (1971). Defendants argue that this is "consistent" with their position because a "prerequisite" could refer only to requirements that, if not met, result in an "absolute denial" of the franchise. Defs. Br. 27. Apart from the fact that the definition is not exhaustive, any ambiguity is dispelled by the Voting Rights Act, which uses the same definition and receives the "broadest possible scope." *Allen v. State Bd. of Elections*, 393 U.S. 544, 566-67 (1969).

---

- The Fourteenth Amendment's enforcement power did not authorize Congress to lower the voting age, since "it was found necessary to amend the Constitution in order to confer a federal right to vote upon Negroes and upon females." *Id*. at 293 (Stewart & Blackmun, JJ., Berger, C.J.).

- The Fourteenth Amendment "left to future interpreters . . . the task of resolving in accordance with future vision and future needs the issues that [its framers] left unresolved," but the Voting Amendments ensured that particular antidiscrimination principles would "stand upon a firmer foundation tha[n] mere legislative action capable of repeal or the vagaries of judicial decision." *Id*. at 275-76 (Brennan, White, & Marshall, JJ.).

Defendants also ask the Court to disregard the Senate Judiciary Committee report on the Twenty-Sixth Amendment. As Plaintiffs observed, that Report urged that requiring younger voters to "go to greater pains" to vote than older voters was "inconsistent with the purposes of the Voting Rights Act." Pls. Br. 15-16. Defendants argue that this is irrelevant because the Committee viewed absentee ballots as a potential "burden" on younger voters. Defs. Br. 28. But the Committee made that statement in the context of state proposals to "keep[] . . . younger voters out of the usual polling places," by "requiring them to vote either in centralized locations or by absentee ballot." S. Rep. 92-26 at 14 (1971). This is powerful evidence that the framers of the Twenty-Sixth Amendment *rejected* the proposition that "the right to vote means [only] the ability to cast a ballot" and "not the right to do so in a voter's preferred manner." Defs. Br. 19 (quoting *Tully I*, 977 F.3d at 613); *see also* H.R. Rep. No. 92-37 at 7 ("It is contemplated that the proposed new article will be construed as comparable in scope to the Fifteenth Amendment and the Nineteenth Amendment" and will effectively "confer[] a plenary right on citizens 18 years of age or older to participate in the political process, free from discrimination on account of age.").

Finally, Defendants argue that it is irrelevant that the Voting Rights Act has consistently been understood to apply to absentee as well as in-person voting. *See* Pls. Br. 17-18. Defendants state that this "simply reflects that VRA § 2 prohibits the use of 'political processes' that are 'not equally open' to minority voters." Defs. Br. 30 (quoting 52 U.S.C. § 10301(b)). That is anachronistic; the *Brown v. Post* decision finding a Voting Rights Act violation based on discrimination with respect to absentee

balloting was decided in 1968, more than a decade before the language Defendants cite was added to Section 2. Regardless, the purpose of Section 2(b) is to determine whether a voting law "results in a denial or abridgement of the right . . . to vote." 52 U.S.C. § 10301(a). This language closely tracks the Fifteenth Amendment, so the conclusion that absentee-voting procedures may violate Section 2 remains sharply at odds with Defendants' assertion that the "right to vote" excludes absentee voting.

## II. Defendants Continue To Misconstrue "Abridgment."

Plaintiffs have demonstrated that a state law "abridges" voters' rights on account of age, race, or sex when it treats those voters differently than similarly situated voters based on the protected characteristic—as Indiana's absentee voting laws do here. *See* Pls. Br. 23-25. This construction has been settled in the Voting Amendment context for two decades. Defendants respond that Indiana does not "abridge" the rights of Plaintiffs and other voters under age 65 merely by "mak[ing] voting 'easier'" for older voters. But *Bossier Parish* squarely rejected that construction, and it "ignores the equality dimension" that is the "essence" of the Voting Amendments—a "right to be treated equally with respect to the vote." Vikram David Amar, *Taking (Equal Voting) Rights Seriously: The Fifteenth Amendment As Constitutional Foundation, & the Need for Judges to Remodel Their Approach to Age Discrimination in Political Rights*, 97 Notre Dame L. Rev. 1619, 1635 (2022).

### A. Defendants ignore *Bossier Parish*.

Relying on the Fifth Circuit's split decision in *Texas Democratic Party*, Defendants argue that an "abridgment" occurs for purposes of the Twenty-Sixth Amendment only if (1) a law "makes it more difficult for the challenger to exercise

her right to vote relative to the status quo," or (2) "the status quo itself is unconstitutional." Defs. Br. 42-43. *Bossier Parish* forecloses that test, yet Defendants all but ignore the case. *See* Pls. Br. 25-27.

1.    The first part of Defendants' proposed test would use a "retrogression" standard to determine abridgment, equivalent to the standard that applies to abridgment claims under Section 5 of the Voting Rights Act. *See Beer v. United States*, 425 U.S. 130, 141 (1976) (holding that changes in voting procedure violate Section 5 if they "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise"). This Court has similarly characterized an argument that a statute "forbids any change in state law that makes voting harder for any identifiable group" as seeking an "anti-retrogression rule." *Luft v. Evers*, 963 F.3d 665, 673 (7th Cir. 2020). And while the Voting Rights Act "does contain an anti-retrogression rule," the rule "is in § 5(b)," not Section 2. *Id.*

Retrogression cannot be the rule for the Twenty-Sixth Amendment because the Supreme Court has held that "abridgment" has a *different* meaning in the Fifteenth Amendment (and Section 2) than it does in Section 5. *Bossier Parish*, 528 U.S. at 334; *see also Luft*, 963 F.3d at 673 ("Section 2 must not be read as equivalent to § 5(b)."). This "is faithful to the differing contexts in which the term is used." *Bossier Parish*, 528 U.S. at 334. Defendants do not—and cannot—cite anything to suggest that the context of the Twenty-Sixth Amendment is more akin to Section 5 of the Voting

Rights Act than the Fifteenth Amendment. *See* Pls. Br. 9-12. Thus, *Bossier Parish* plainly forecloses Defendants' construction.[4]

**2.** The second part of Defendants' proposed test would ask whether the "status quo itself is unconstitutional." That simply begs the question. The purpose of this test is to decide *if* there has been an unconstitutional "abridgment" of the right to vote. Whether the "status quo" is unconstitutional is exactly what is at issue.

Unsurprisingly, Defendants' formulation rests on a misinterpretation of *Bossier Parish*. That case discussed the status quo not as a standalone test, but to explain the differences in how the necessarily-comparative "abridgment" analysis operates under the Constitution versus Section 5. Section 5 proceedings "deal only and specifically with changes in voting procedures," so for these proceedings the relevant baseline is "the status quo that is proposed to be changed." 528 U.S. at 334. Proceedings under the Fifteenth Amendment, by contrast, "involve not only changes but (much more commonly) the status quo itself." *Id.* This means that, for constitutional claims, the "status quo itself" *cannot* be the comparative baseline.

Instead, in such cases, "the comparison must be made with a hypothetical alternative," comparing the status quo to "what the right to vote *ought to be.*" *Bossier Parish*, 528 U.S. at 334. This "hypothetical alternative" test asks not whether the law

---

[4] Because *Bossier Parish* forecloses Defendants' retrogression test, there is no need to address whether it is inconsistent with earlier precedent. *See* Pls. Br. 26. Nevertheless, Defendants are incorrect that *Harman v. Forssenius*, 380 U.S. 528 (1965), supports a retrogression theory. Defendants argue that the alternative registration procedure Virginia imposed in that case was more "cumbersome" for voters than the poll tax. Defs. Br. 44-45. As the Supreme Court stated, however, "[t]he requirement imposed upon those who reject the poll tax method of qualifying would not be saved even if it could be said that it is no more onerous, or even somewhat less onerous, than the poll tax." 380 U.S. at 542.

is retrogressive, but whether the law reflects "discrimination more generally." *Id*. In other words, to decide whether the status quo "abridges" the right to vote under the Voting Amendments, a court should ask whether voters are treated differently on account of a constitutionally protected characteristic: *i.e.*, race, sex, or—as here—age.

**3.**     Defendants argue that "[e]very exercise of the franchise" requires "effort and compliance with some rules" and that a voter's rights are not "abridged" by contending with the "ordinary, incidental burdens" of voting. Defs. Br. 36 (quoting *Brnovich v. Democratic Nat'l Committee*, 141 S. Ct. 2321, 2338 (2021)). Relatedly, Defendants argue that Section 2 of the Voting Rights Act "does not condemn a voting practice just because it has a disparate effect on minorities." *Id*. at 37 (quoting *Frank v. Walker*, 768 F.3d 744, 753 (7th Cir. 2014)). These observations are inapposite because, in *Brnovich* and *Frank*, there was no discriminatory classification on the face of the statute. That is a crucial distinction.

The Supreme Court has long held that the Voting Amendments are "self-executing" and, as noted above, they have been "construed, without further legislative specification, to invalidate state voting qualification or procedures which are discriminatory *on their face*." *Katzenbach*, 383 U.S. at 325 (emphasis added); *see also United States v. Mosley*, 238 U.S. 383, 392 (1915) ("The Fifteenth Amendment is self-executing in striking the word 'white' from all laws granting the right of suffrage."); Pls. Br. 27-28. For facially discriminatory laws, there is no need to resort to Section 2, much less its effects test, which (as Defendants note) prohibits laws that have the

effect of denying or abridging the right to vote even if they lack a discriminatory purpose. *See City of Mobile v. Bolden*, 446 U.S. 55, 62 (1980) (plurality op.).

*Brnovich*, which involved facially neutral voting laws, did not cast doubt on the rule that facially *non*-neutral voting laws violate the Voting Amendments when they discriminate on race, sex, or age. To the contrary, the Supreme Court repeatedly emphasized the laws' neutral character. *E.g.*, 141 S. Ct. at 2343 ("§ 2 does not deprive the States of their authority to establish *non-discriminatory* voting rules") (emphasis added). Similarly, in addressing Wisconsin's voter ID laws in *Frank*, this Court stressed that "Act 23 does not draw any line by race" and "extends to every citizen an equal opportunity to get a photo ID." 768 F.3d at 753. The same is obviously not true of Indiana's absentee voting laws based on age. *Cf. Texas Democratic Party v. Abbott*, 961 F.3d 389, 416 (5th Cir. 2020) (Ho., J., concurring) (it would "presumably" violate the Fifteenth Amendment "to allow only voters of a particular race to vote by mail").

Relatedly, the multipart test the Supreme Court fashioned in *Brnovich* was tied to a concern that Section 2 not "uproot *facially neutral* time, place, and manner regulations that have a long pedigree or are in widespread use in the United States." *Brnovich*, 141 S. Ct. at 2339 (emphasis added); *see also id*. at 2341 ("[d]emanding such a tight fit would have the effect of invalidating a great many neutral voting regulations"). The Supreme Court explained that "every voting rule imposes a burden of some sort," *id*. at 2338, and that it may be "virtually impossible for a State to devise rules that do not have some disparate impact." *Id*. at 2343. But as with the Fourteenth Amendment, while this may warrant flexibility in the Section 2 effects

test, it does not mean that states are free to pass laws that on their face violate the specific guarantees in the Voting Amendments. *See supra* pp. 3-4 & 6-7.[5]

Another voter ID case Defendants cite also counsels against this position. It too involved a "neutral, nondiscriminatory regulation of voting procedure." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 204 (2008) (lead opinion); *see also id*. at 205 (Scalia, J., concurring) ("The Indiana photo-identification law is a generally applicable, nondiscriminatory voting regulation."). Further, in determining that the plaintiffs had not shown a violation under the *Anderson-Burdick* test, it was significant in that case that absentee voting provided a mechanism (for some) to alleviate burdens on the right to vote. *Id*. at 201 ("although it may not be a completely acceptable alternative, the elderly in Indiana are able to vote absentee without presenting photo identification"). Indeed, Indiana itself argued that its voter ID law "does not apply to voting absentee by mail, which means that the disabled and seniors over 65 (who are automatically entitled to vote absentee) face no ill effects from the Law even if they have no photo identification." Br. of State Respondents 41, *Crawford v. Marion Cnty. Election Board*, No. 07-21 (U.S.), 2007 WL 4232930.

Finally, that states may have "legitimate reasons" for desiring to "assist[] the aged" (Defs. Br. 46) is no defense. Plaintiffs do not believe that the legislators who passed Indiana Code § 3-11-10-24 acted with animus toward younger voters. Animus, however, is not an element of a Voting Amendment claim. *See Davis*, 932 F.3d at 843

---

[5] In addition, the Supreme Court separately addressed whether Arizona's absentee-ballot collection law was enacted with a hidden "discriminatory purpose." *Brnovich*, 141 S. Ct. at 2348-50. That discussion would have been unnecessary if the effects test alone determined the "abridgment" inquiry.

(a court need not "equate" a law's purpose "with the racial animus motivating other laws that run afoul of the Fifteenth Amendment" to find the law unconstitutional).

**B.      History again does not support Defendants.**

Citing *Houston Community College System v. Wilson*, 142 S. Ct. 1253 (2022), which stated that a "regular course of practice" may bear on disputes about the Constitution's meaning, Defendants argue that other states have adopted age-based absentee voting laws since 1971. Defs. Br. 41. Such laws remain the exception, however, so the practice here is hardly clear-cut. *See* Pls. Br. 2. Moreover, the fact that the statutes have thus far gone unchallenged is not a guarantee of constitutionality. *E.g*, *Bartnicki v. Vopper*, 532 U.S.514, 517 (2001) (striking down restrictions on disclosure of illegally intercepted communications that had been part of federal law since 1934). Additionally, practice was not dispositive in the *Wilson* case, and the Supreme Court has since clarified that, "to the extent later history contradicts what the text says," the "text controls." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2136-37 (2022). That is especially true here, where the relevant text appears throughout the Constitution and the Voting Rights Act.

Defendants also argue that states make voting accommodations for the elderly in other ways. Defs. Br. 41-42. Those laws may or may not be constitutional, but that question is not presented in this case. *Cf. Bostock*, 140 S. Ct. at 1753 ("None of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today."). In any case, several of the purported "accommodations" for older voters that Defendants identify are of questionable relevance.

For instance, Defendants assert that Plaintiffs' reading of the Twenty-Sixth Amendment would "prohibit" certain accommodations in the Voting Accessibility for the Elderly and Handicapped Act, which seeks to "promote the fundamental right to vote by improving access for handicapped and elderly individuals to registration facilities and polling places for Federal elections." 52 U.S.C. § 20101 *et seq*. However, a glance at the statute shows that there is no conflict. To accomplish its goal, the Act requires states to ensure that polling places are accessible to elderly and handicapped voters, *id*. § 20102; provide accessible voter registration facilities, *id*. § 20103; limit medical certifications for handicapped voters that are voting absentee, *id*. § 20104; and make registration and voting aids available, *id*. These requirements are laudable—and they are also entirely consistent with the Twenty-Sixth Amendment. None makes it more difficult for younger voters to vote compared to older voters.

## III.    The Law-Of-The-Case Doctrine Remains Inapplicable.

As shown above, a proper application of Voting Amendments precedent shows that Indiana's absentee-voting laws violate the Twenty-Sixth Amendment and Plaintiffs are entitled to summary judgment on their claim. Defendants cannot short-circuit that outcome through the law of the case, which does not constrain this Court on appeal. *See* Pls. Br. 28-34.

1.    Although Defendants argue that preliminary injunction decisions can be law of the case, there is a distinction between a preliminary injunction decision that stops at the likelihood-of-success element and a decision that actually takes an "unequivocal position on the merits." *Pitt News v. Pappert*, 379 F.3d 96, 104-05 (3d Cir. 2004). The panel did not take an "unequivocal position" on the Twenty-Sixth

Amendment claim here. It stated only that the claim was "unlikely to succeed." *Tully I*, 977 F.3d at 614. Defendants do not address this language.

Two other considerations bolster this conclusion. First, the preliminary injunction proceedings in this case were expedited, not only because of the pending election but because of the health emergency declared as a result of COVID-19. Law of the case "may be inapplicable when the legal conclusions in a preliminary-injunction decision were . . . issued under time pressures related to the circumstances of the preliminary injunction at issue." *Daunt v. Benson*, 999 F.3d 299, 308 (6th Cir. 2021). Additionally, as Defendants admit, *Tully I* invoked the "*Purcell* principle" as a basis for caution in the preliminary injunction phase. Defs. Br. 17. True, this Court has characterized *Tully I* as being "decided on other grounds." *Common Cause Indiana v. Lawson*, 978 F.3d 1036, 1042 (7th Cir. 2020). But in the same sentence, the Court stressed that "*Tully* emphasized how wary *Purcell* made us" when resolving the underlying legal claim. *Id*. That is precisely why it makes sense to revisit the legal question now, on a regular briefing schedule and when *Purcell* is not an issue.

**2.**     Even if the Court's earlier decision were law of the case, the intervening *Brnovich* decision justifies re-evaluation. Defendants argue that *Brnovich* addressed Section 2 of the Voting Rights Act. Defs. Br. 18. But having spent pages arguing that *McDonald* and *Brnovich* should control in this case even though neither decision mentioned the Twenty-Sixth Amendment, Defendants cannot have it both ways.

Nor do Plaintiffs ask the Court to "assume that the Supreme Court 'overruled' *McDonald*" in *Brnovich*. Defs. Br. 18-19. *McDonald*'s validity is not at issue. The

question is whether to *extend McDonald* to this very different context. *See* Pls. Br. 32.
If *McDonald* truly applied to the Voting Amendments as well as the Fourteenth
Amendment, it is inconceivable that no Justice would have raised *McDonald* in
*Brnovich* when discussing absentee-ballot laws challenged under a statute that
represents the paradigmatic exercise of "the power conferred by § 2 of the Fifteenth
Amendment" on Congress. 141 S. Ct. at 2331. Again, as Plaintiffs have shown, this
discrepancy warrants reconsideration. *See* Pls. Br. 31-33.

**3.**     Separately, the Court's preliminary injunction decision is clearly
erroneous. Plaintiffs do not lightly ask this Court to find one of its recent decisions to
be clear error. Nevertheless, as shown above, that decision did not grapple with the
weighty textual and doctrinal problems with its characterization of the "right to vote."
*Cf. Tully I*, 977 F.3d at 619 & n.1 (Ripple, J.) (questioning the majority's "rigid rule"
and cautioning that "we ought to keep our powder dry"). Defendants remark that a
decision is clearly erroneous only if it strikes with the force of a "dead fish." Defs. Br.
19 (quoting *Rothner v. City of Chicago*, 929 F.2d 297, 301 n.6 (7th Cir. 1991)). That
description, while colorful, is not a legal test. *See Santa Fe Pacific Corp. v. Central
States, Se. & Sw. Plan*, 22 F.3d 725, 727 (7th Cir. 1994). To find clear error, it is
sufficient that a decision "would be decided differently" under current law. *Agostini
v. Felton*, 521 U.S. 203, 236-37 (1997). Respectfully, that is clearly the case here.

## IV.     Remedial Arguments Are Premature.

As a final point, Defendants assert that if Indiana's absentee-voting scheme
violates the Twenty-Sixth Amendment—as it does—the Court should sever the
invalid statutory provision. Defs. Br. 47-49. This would preclude those 65 years and

older *and* those under 65 years of age from casting an absentee ballot by mail on account of their age. It is ironic that the remedy Defendants appear to prefer in this case would "abridge" older voters' rights under Defendants' (mistaken) view of that term. Irony aside, this appeal does not present remedial questions.

When Plaintiffs moved for summary judgment in the district court, they expressly asked the district court to save remedies for a later date. *See* Dkt. 113 at 16 ("Once the Court determines the constitutionality of Indiana's absentee voting statute, it can address the appropriate remedy for the violation in subsequent proceedings."). The district court never addressed this question because it thought Indiana's voting laws were constitutional, and there is no occasion to decide the proper remedy on appeal either. This Court typically does not consider issues that were not passed on below. *AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 523 (7th Cir. 2001); *see also Baker v. Carr,* 369 U.S. 186, 198 (1962) ("Beyond noting that we have no cause at this stage to doubt the District Court will be able to fashion relief if violations of constitutional rights are found, it is improper now to consider what remedy would be most appropriate if appellants prevail at the trial.").

Defendants also overlook the severability principles that apply in this context. A century ago, observing that voting is "a right whose exercise lies at the very basis of government," the Supreme Court called for a "much more exacting standard" in addressing severability in voting cases. *Guinn v. United States*, 238 U.S. 347, 366 (1915). *Guinn* struck down Oklahoma's grandfather clause exempting all persons entitled to vote prior to January 1, 1866 and their descendants from a literacy test.

*Id*. at 364-65. The Supreme Court concluded that, rather than apply the literacy requirement to all voters (equally burdening the right to vote), the proper remedy was to strike down the literacy test. *Id*. at 366-67. As one commentator has noted, "because the right to vote is so fundamental," a remedy that "assure[d] equality" by "leveling down" the right to vote "would be absurd." Pamela S. Karlan, *Equal Protection, Due Process, and the Stereoscopic Fourteenth Amendment*, 33 McGeorge L. Rev. 473, 491 (2002). Defendants do not cite any cases that embrace a "leveling down" remedy for voting rights or another fundamental right.

Last, Defendants ignore the possibility that the district court could stay its judgment to give the Indiana legislature an opportunity to decide for itself how to correct the constitutional flaw. This approach—which has a long history in voting cases[6]—would permit the legislature to balance the considerations that Defendants identify and could also minimize unintended voter confusion.

## CONCLUSION

Indiana's absentee voting laws abridge the rights of younger voters to vote on account of age. The Court should reverse the judgment below.

---

[6] *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 142-43 (1976) (discussing the practice of issuing a "limited stay" in "apportionment and voting rights cases" and collecting cases); *Maryland Comm. for Fair Representation v. Tawes*, 377 U.S. 656, 675 (1965) (deeming it "inappropriate to discuss remedial questions at the present time" because the next general election would not take place for a year and the state legislature could still enact a "constitutionally valid state legislative apportionment scheme in a timely fashion").

Dated: February 24, 2023

Respectfully submitted,

William R. Groth, Of Counsel
VLINK LAW FIRM LLC
3719 S. East St., Suite A
Indianapolis, IN 46227
(317) 637-2345, Ext. 132
WGroth@fdgtlaborlaw.com

Mark W. Sniderman
SNIDERMAN LAW
151 N. Delaware Street, Ste. 1520
Indianapolis, IN 46204
(317) 361-4700
msniderman@snidermanlaw.com

/s/ *Jed W. Glickstein*
Jed W. Glickstein
   *Counsel of Record*
Gary A. Isaac
Michael A. Scodro
Brett E. Legner
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600
jglickstein@mayerbrown.com
gisaac@mayerbrown.com
mscodro@mayerbrown.com
blegner@mayerbrown.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2023, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.


/s/ *Jed W. Glickstein*
Jed W. Glickstein

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Circuit Rule 32(c) because it contains 6,989 words, excluding the parts exempted by rule; and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Circuit Rule 32(a)(6) because the body of the brief has been prepared in 12-point Century Schoolbook font and the footnotes have been prepared in 11-point Century Schoolbook font using Microsoft Word 2016.

/s/ *Jed W. Glickstein*
Jed W. Glickstein

*Counsel for Plaintiffs-Appellants*